307 Ga. 634
FINAL COPY

S19A1284.  GASTON v. STATE.

BETHEL, Justice.

In October 2016, a jury found Lerenzo Gaston guilty of felony

murder and other crimes in connection with the shooting death of

Terrance Walker.[1] Gaston appeals, contending that he received

ineffective assistance of trial counsel because counsel (1) did not

request a jury charge on justification; (2) did not object to the State's

closing argument referencing evidence outside the record; (3) did not

[1] The crimes occurred on November 2, 2011. On March 12, 2012, Gaston was indicted by a Spalding County grand jury for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), aggravated assault (Count 3), and possession of a firearm during the commission of a felony (Count 4). At a jury trial held on October 3 to 6, 2016, Gaston was found not guilty of malice murder, but was found guilty of the remaining counts. Gaston was sentenced to life imprisonment for felony murder, and a consecutive term of five years for the firearms possession count (Count 4). The trial court merged the aggravated assault count with the felony murder count.
    Gaston filed a motion for new trial on November 2, 2016, and amended it twice through new counsel. A hearing on the motion for new trial as amended was held on February 11, 2019, and the trial court denied Gaston's motion on March 27, 2019. Gaston filed a notice of appeal on April 16, 2019, and amended it on April 29, 2019. Gaston's case was docketed to this Court's August 2019 term and was orally argued on September 11, 2019.

object to the admission of a prior consistent statement; and (4) did not introduce evidence that a witness initially denied seeing Gaston shoot Walker. For the reasons stated below, we affirm.

1. Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed that sometime during the fall of 2011, Gaston solicited sex from Maegan Bostic, who was working as a prostitute at the time. Bostic agreed to have sex with Gaston, and the two drove to an apartment complex where some acquaintances lived. When they arrived, the two prepared to engage in intercourse; however, Gaston refused to use a condom, and the act was not consummated. Bostic then demanded Gaston drive her back to the motel from which he had picked her up.

When they arrived back at the motel, Bostic informed her then-boyfriend, Walker, what had happened. Walker demanded that Gaston pay Bostic for her time. Gaston refused and threatened to "shoot [the] place up," but Bostic told those present that Gaston was unarmed. "The people at the [motel]" then began shooting at Gaston's vehicle, and Gaston attempted to flee in his vehicle. He

2

wrecked his vehicle in the process and then fled on foot.

A month or two later, during the afternoon of November 2, 2011, Walker's mother drove him to an apartment complex where Walker's brother was staying. Gaston — who was parked across the street from the apartment complex at the time — followed Walker and his mother into the complex in a black car. Shortly after Walker got out of his mother's vehicle, Gaston drove back out of the complex. A short time later, while Walker was standing in a grassy area between some apartments, Kimberly Seaborn saw Gaston and another person approach Walker from behind.[2] The pair began shooting at Walker, ultimately shooting him four times — once in the back of each thigh, once in his left hip, and once in the head.

---

[2] Kimberly Seaborn approached law enforcement officers during their investigation of Walker's death. Seaborn told investigators that she had information about the shooting. During a recorded interview with investigators, Seaborn recounted that she saw Walker's mother drop him off at the apartment complex, and that she saw Gaston and another person run up behind Walker, heard shots, and "got the hell on" once the shooting started. Seaborn stated she had "no doubt" that Gaston was the shooter and identified him as the shooter in a police lineup. At trial, however, Seaborn recanted, testifying that she was high during her interview with investigators, and that while she heard shots, she could not "place [Gaston] there shooting [Walker] that day."

Walker's brother heard shots and then saw Gaston and another individual flee into the adjacent woods.

Walker died from his injuries at the scene. No weapons were found on or near his body, although a cell phone and ear buds were found in Walker's left hand. In addition, a .40-caliber bullet was found "in [Walker's] clothing," and a .38-caliber lead bullet was found in his head. Law enforcement also found four .40-caliber shell casings and one 9mm shell casing at the scene. Law enforcement later determined that each of the .40-caliber casings was fired from the same weapon; that the .40-caliber bullet was consistent with having been fired from that same weapon; that the .38-caliber bullet was fired from a revolver; and that the 9mm casing was fired from a third weapon. Gaston had been known to carry both a .40-caliber and 9mm handgun.[3]

Several months after the shooting, Bostic saw Gaston at a gas

---

[3] Also at the scene, law enforcement discovered a "trail" of blood in the vicinity of the shooting, spanning the field where Walker's body was found. DNA testing revealed that the blood belonged neither to Gaston nor Walker. The record does not suggest the identity of the person seen with Gaston while he was approaching Walker's location.

station. Gaston told Bostic, "I got him. You're next." At trial, Gaston's ex-girlfriend, Jaquita Mack, testified that shortly after Walker's death, she overheard Gaston admit to killing someone.

Gaston elected not to testify on his own behalf at trial. He called no witnesses, and he did not tender any other evidence in his defense.

Although Gaston has not challenged the sufficiency of the evidence, it is our customary practice to review the sufficiency of the evidence in murder cases, and we have done so here. After reviewing the record of Gaston's trial, we conclude that the evidence presented against him was sufficient to authorize a rational jury to find beyond a reasonable doubt that Gaston was guilty of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 318-319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). See also *Brown v. State*, 302 Ga. 454, 456 (1) (b) (807 SE2d 369) (2017) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (citation and punctuation omitted)).

2. Gaston contends that his trial counsel provided ineffective assistance due to counsel's failure to (a) request an instruction on justification; (b) object to the State's closing argument referencing evidence outside the record; (c) object to Mack's prior consistent statement; and (d) introduce evidence that Seaborn initially denied seeing Gaston shoot Walker. We disagree.

To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant. *Swanson v. State*, 306 Ga. 153, 155 (2) (829 SE2d 312) (2019) (citing *Strickland v. Washington*, 466 U. S. 668, 687-695 (III) (104 SCt 2052, 80 LE2d 674) (1984)). To satisfy the deficiency prong, a defendant must show that trial counsel "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013). This requires a defendant to "overcome the strong presumption that trial counsel's performance was adequate." (Citation and punctuation

omitted.) *Swanson*, 306 Ga. at 155 (2). To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. *Strickland*, 466 U. S. at 694 (III). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

(a) Gaston first argues that he received ineffective assistance from his trial counsel due to counsel's failure to request an instruction on a justification defense. We disagree. Gaston contends that trial counsel erroneously thought he could not request a justification instruction without Gaston telling him that he acted in self-defense.[4]

---

[4] At the hearing on the motion for a new trial, trial counsel testified that he did not pursue a justification charge because there was no evidence in the record to support self-defense, and that Gaston never told him that he had shot Walker in self-defense. Trial counsel further testified that he could not

> ethically argue something where you know the opposite to be true
> . . . . So if the client never tells me he shot somebody in self-defense,
> if there are no facts that I could reveal through my investigation
> that would suggest to me that it was a self-defense argument, it
> wouldn't be something that I could argue in the end, especially
> without the client taking the stand . . . . But attorneys are bound
> to do some investigation and then make arguments that are

7

If there is some evidence to support more than one theory, "a defendant who pursues alternative defense theories is entitled to requested charges on both theories." (Citation and punctuation omitted.) *Williams v. State*, 297 Ga. 460, 462 (2) (773 SE2d 213) (2015); see also *Wainwright v. State*, 305 Ga. 63, 70 (5) (823 SE2d 749) (2019) ("[T]o authorize a requested jury instruction, there need only be slight evidence supporting the theory of the charge." (citation and punctuation omitted)). However, it is rarely an unreasonable strategy to not pursue defenses that logically conflict. See *McClure v. State*, 306 Ga. 856, 866 (834 SE2d 96) (2019) (Nahmias, J., concurring) ("[W]hat the law *allows* may be bad *strategy* for a defendant." (emphasis in original)).

Pretermitting whether trial counsel was deficient, Gaston fails to establish that he was prejudiced by his trial counsel's failure to

truthful in court. So only if I were willing, I think, to violate the Georgia Rules of Professional Conduct could I have done that . . . . [H]ad [Gaston] said that he shot [Walker] in self-defense, that he feared for his safety, that he was even present, of course I would have submitted a request to charge for self-defense and we would have pursued that theory.

request a jury instruction on justification. Here, absent counsel's alleged mistaken understanding of the law and his professional obligations, Gaston would have been left with two choices in addition to the misidentification defense he mounted. Trial counsel could have requested an instruction on both misidentification and justification, or trial counsel could have abandoned the misidentification theory and relied solely on a theory of justification. As we have previously noted, although a defendant may choose to pursue alternative defense theories, doing so may risk alienating the jury, particularly where there is only slight evidence to support a theory. *Muller v. State*, 284 Ga. 70, 71-72 (3) (663 SE2d 206) (2008). While that risk exists where trial counsel presents inconsistent defense theories, such as accident and self-defense, the risk that a jury may reject both defenses is great where trial counsel presents defense theories that logically conflict, such as misidentification and self-defense. See *McClure*, 306 Ga. at 866 (Nahmias, J., concurring) ("Presenting inconsistent defenses to the jury, particularly when the evidentiary support for one defense is considerably weaker than for

9

others or where a defense is contradicted by the defendant's own account of events, risks losing credibility for all of the defenses." (emphasis omitted)); see also *Hills v. State*, 306 Ga. 800, 807 (3) (a) n.10 (833 SE2d 515) (2019) ("[T]he assertion of inconsistent theories of defense runs the further risk that the State will seize upon the opportunity to aggressively point out in closing argument inconsistencies between those theories and the differing view of the evidence that would be required to support each of them." (citation and punctuation omitted)).

Gaston argues that trial counsel's alleged deficiency was prejudicial because the jury found Gaston not guilty of malice murder, meaning that the jury believed that Gaston intended to shoot Walker, but not to kill him. Gaston further argues that this suggests that an instruction of self-defense might have caused at least one juror who voted to convict to decide otherwise. However, such speculation does not establish a reasonable probability that the jury would have reached a different result. See, e.g., *Hinton v. State*, 304 Ga. 605, 608 (2) (820 SE2d 712) (2018) (where jury found

10

appellant not guilty of malice murder but guilty of felony murder and predicate aggravated assault, appellant failed to establish a reasonable probability that the jury would have reached a different result where "evidence of Hinton's guilt was strong, and any evidence supporting a[n] [alternative] voluntary manslaughter theory was weak"); *Fuller v. State*, 278 Ga. 812, 814 (2) (b) (607 SE2d 581) (2005) (where jury found defendant not guilty of malice murder but guilty of felony murder and predicate aggravated assault, defendant failed to show, given the strength of the evidence, that but for trial counsel's alleged failure to elicit an alternative voluntary manslaughter charge there was a reasonable probability that the result of his trial would have been different).

Here, there was at best slight evidence presented at trial that would have allowed the jury to infer that Gaston acted in self-defense. Law enforcement found blood belonging neither to Gaston nor Walker at the scene, indicating that a third person was present and was wounded. Law enforcement also recovered three different shell casings at the scene, indicating that three different weapons

11

may have been used in the shooting. However, there was no direct evidence that Walker was armed, or that Gaston was in imminent danger from Walker at the time of the shooting. See OCGA § 16-3-21 (a) ("A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's *imminent* use of unlawful force[.]" (emphasis supplied)). The fact that Gaston and Walker had a previous altercation in the months prior to Walker's shooting does not change this. See *Carter v. State*, 285 Ga. 565, 566 (2) (678 SE2d 909) (2009) (noting that "[t]he fact that [the victim] may have made a threat against [the appellant's father] earlier in the evening" of the shooting was not enough to show the appellant was in imminent danger from the victim).

By contrast, the evidence cutting against a theory of justification included testimony from eyewitnesses that, when taken together, indicated that Gaston followed Walker by car into the apartment complex, subsequently left the complex in the same car,

12

and returned on foot with another person. The pair then ran up behind Walker, who was standing in a field between apartments, and shot him four times before fleeing into the wooded area adjacent to the apartment complex. No weapons were found on or near Walker's body, and Walker's brother testified that Walker did not have a gun.

Because of the weak evidence supporting a justification theory, Gaston has failed to show that, had trial counsel requested a self-defense instruction, there is a reasonable probability that the outcome of the trial would have been different such that it undermines confidence in the outcome of Gaston's trial. *Strickland*, 466 U. S. at 694 (III) (B). Consequently, Gaston has failed to show that he was prejudiced by trial counsel's alleged deficient performance.

(b) Gaston next argues that his trial counsel provided ineffective assistance by failing to object to the State's closing argument referencing evidence not presented at trial. During direct examination of Gaston's girlfriend, Mack, the State entered her

13

phone records into evidence and questioned her about a text sent to her phone asking for a gun. Although Mack testified that she did not remember the text or recognize the number, she did testify that she and Gaston shared a phone and that Gaston would text her from different numbers when they were not together.[5] During closing arguments, the State referenced this text message, stating that Mack knew that Gaston had killed someone because "he sent her

---

[5] Q: So there on October 28th, 2011, your phone received a text from a number — now, let me ask you this before I even go there: Did the defendant, [Gaston], have a phone?
A: No.
Q: Okay. So whose phone — Do you know whose phone he would use?
A: My phone.
Q: Okay. Well, let me ask you this: When he wasn't with you — was it times that y'all weren't together?
A: Yes.
Q: Okay. And so the times that you guys weren't together, would he sometimes call you or text you?
A: Yes.
Q: And so if he didn't have a phone, do you know, like, how he would do that, how he would call and text you when you guys weren't together?
A: Other person's phone.
Q: Okay. So he would use different persons' [sic] phone.
A: Yes.
Q: Okay. So on October 28th, 2011, you received a text . . . and it says, I need a pistol. What's your brother got for me?
A: I don't remember that text.
Q: Okay. You don't remember that text. Do you remember whose phone number that belonged — that phone number?
A: No.

that text message a few days before . . . . So, really she was trying to defend him. Because you know what? He sent her that text message."

"A prosecutor is granted wide latitude in the conduct of closing argument, the bounds of which are in the trial court's discretion. Within that wide latitude, a prosecutor may comment upon and draw deductions from the evidence presented to the jury." (Citations and punctuation omitted.) *Booth v. State*, 301 Ga. 678, 688 (4) (804 SE2d 104) (2017). Here, the prosecutor's argument that Gaston sent Mack the text message asking for a gun prior to the shooting death of Walker was "based on permissible inferences and legitimately supported by the facts in evidence." *Cooper v. State*, 296 Ga. 728, 731 (3) (770 SE2d 597) (2015). Mack's phone records were in evidence, as was her testimony that Gaston would text her from different numbers. Although Mack did not testify that this specific text came from Gaston, the prosecutor had wide latitude in connecting the facts in evidence, and the jury was authorized to infer that Gaston sent the text message at issue, despite Mack's claim that she did not

recognize the number or remember the text message. See *Faust v. State*, 302 Ga. 211, 219-220 (4) (c) (805 SE2d 826) (2017) (prosecutor permitted to argue that defendant intended to commit robbery where evidence showed that defendant approached victim with a rifle after discussing sale of items); see also *Martinez v. State*, 302 Ga. 86, 89 (3) (805 SE2d 44) (2017) (prosecutor permitted to argue that rape occurred over the hood of a car where evidence showed that victim's injuries were consistent with damage to hood of the car and defendant's blood was found on the hood of the car); *Menefee v. State*, 301 Ga. 505, 515-516 (4) (a) (v) (801 SE2d 782) (2017) (prosecutor permitted to argue that victims' guns had not been fired where evidence showed that bullets and shell casings collected from the shooting scene were not fired from those guns).

Because the prosecutor's comments during closing arguments were within the bounds of permissible argument, "trial counsel's failure to make a meritless objection to the State's closing argument is not evidence of ineffective assistance." *Cooper*, 296 Ga. at 731 (3). See also *Johnson v. State*, 296 Ga. 504, 508-509 (4) (769 SE2d 87)

16

(2015) ("[B]ecause the arguments made by the State in closing were not improper, they did not require any curative instruction by the trial court, and the failure to make an objection to those arguments cannot constitute ineffective assistance."). This claim of ineffective assistance therefore fails.

(c) Gaston further argues that his trial counsel provided ineffective assistance by failing to object to the introduction of Mack's prior consistent statement implicating Gaston. However, this claim of ineffectiveness fails because trial counsel was not deficient for failing to renew his objection to Mack's text message after the trial court had already overruled his earlier objection. Under the current Evidence Code, "[o]nce the court makes a definitive ruling on the record admitting or excluding any evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve such claim of error for appeal." OCGA § 24-1-103 (a). See also *Anthony v. State*, 298 Ga. 827, 831-832 (4) (785 SE2d 277) (2016) (where trial court ruled at pretrial hearing that certain evidence would be admissible, trial counsel did not need to object to

that evidence during trial to preserve the issue on appeal). Here, at trial, but prior to Mack's testimony, Gaston's trial counsel objected to the admission of an outgoing text message sent by Mack on the night Walker was shot, which stated "I'll come, but I just want to chill. At least pay me 20 for chilling my home boy got killed by the n**** I went with." Trial counsel argued that the text message was hearsay because Mack's knowledge about the identity of Walker's killer was based not on her personal knowledge, but on what someone other than Gaston had told her. In response, the State argued that whether the text message was based on Mack's personal knowledge or whether it was based on something Mack had heard was a question for the jury, and that Mack would admit that she had sent the text message from her cell phone. The State also indicated that Mack would later testify that she overheard Gaston admit to "just kill[ing] someone." The trial court overruled trial counsel's objection.

During Mack's testimony, Mack testified that she learned about Walker's shooting the day after it occurred. Mack then

18

testified that she last saw Gaston the day after the shooting, during which she heard Gaston admit to "kill[ing] somebody." Later during Mack's testimony, after her phone records had been introduced, the State asked Mack about the text message sent on the night of the shooting. Mack confirmed both that she had sent the text message and that the individuals referenced in the text message were Walker and Gaston, respectively. Trial counsel did not renew his objection to Mack's text message. Gaston now argues that Mack's text message was inadmissible both on implied hearsay grounds and because Mack lacked personal knowledge of Gaston killing Walker, especially in light of her testimony that she did not find out about Walker's killing until the day after the shooting, and that trial counsel was deficient "for failing to notice that Mack's prior statement came before she had any personal knowledge, and for failing to keep that evidence out." However, trial counsel had already objected to the admission of the text message, arguing that the text message was not based on Mack's personal knowledge. Because the trial court overruled trial counsel's objection when it

19

was made, trial counsel was not deficient for failing to renew the objection during Mack's testimony.

Even assuming trial counsel should have renewed his objection in light of Mack's testimony that she did not overhear the defendant admit to killing someone until the day after the shooting, Gaston has failed to show that trial counsel's decision not to object was unreasonable, as there were strategic reasons for deciding not to renew the objection. Namely, such objection would have drawn the jury's attention to the testimony. See *Jacobs v. State*, 306 Ga. 571, 575-576 (2) (b) (832 SE2d 363) (2019) (trial counsel's decision not to object to testimony as hearsay not deficient performance where counsel did not want to "overemphasize any of the testimony to the jury by objecting to it"). At the hearing on the motion for a new trial, trial counsel testified that he believed "the real substance of [Mack's] testimony was that the defendant had admitted to killing somebody." As a result, trial counsel's strategy was such that "it was paramount at all times to maintain [his] credibility" with the jury, and noted that this strategy may have "[led] to an acquittal." Trial

20

counsel testified that "[he] did not want to stand up and object to something that [he] didn't think was . . . a significant issue" and that he did not object to the admission of the text message because he did not think it was "significant" due to Mack's earlier testimony that she overheard Gaston admit that he had killed somebody. Because this was a reasonable choice in light of trial counsel's reasonable trial strategy, Gaston has failed to show that his counsel's performance was deficient. This claim of ineffectiveness therefore fails.

(d) Finally, Gaston argues that he received ineffective assistance from his trial counsel due to counsel's failure to cross-examine Seaborn in regard to a recorded interview with investigators, in which she stated that she heard shots but did not see Gaston shoot Walker. "[T]he scope of cross-examination is grounded in trial tactics and strategy, and will rarely constitute ineffective assistance of counsel." (Citation and punctuation omitted.) *McCoy v. State*, 303 Ga. 141, 143 (2) (810 SE2d 487) (2018). More specifically, "[t]he *extent* of cross-examination is a strategic

21

and tactical decision." (Citation and punctuation omitted; emphasis supplied.) *Romer*, 293 Ga. at 344 (3) (a). Decisions about cross-examination "do not amount to deficient performance unless they are so unreasonable that no competent attorney would have made them under similar circumstances." *Washington v. State*, 294 Ga. 560, 566 (3) (755 SE2d 160) (2014).

Gaston has failed to show that trial counsel's decisions about cross-examination were unreasonable. At the hearing on Gaston's motion for new trial, Gaston questioned trial counsel about a partial transcript of Seaborn's interview with law enforcement. The partial transcript indicated that, at one point in the interview (in addition to Seaborn's statements in the interview, noted above in footnote 2, that she saw Gaston and another person run up behind Walker, heard shots, and "got the hell on"), Seaborn stated that she "heard" shots and that "I didn't see him shoot. I seen he was the only person I seen at that man." However, Seaborn had already testified on direct examination that she did not see the shooting. Accordingly, Gaston's ineffectiveness claim fails.

22

While the record reflects that Gaston's trial counsel chose not to cross-examine Seaborn, trial counsel did introduce, through cross-examination of the detective who interviewed Seaborn, evidence that Seaborn told law enforcement that she did not see who shot Walker.[6] During closing arguments, trial counsel focused on the inconsistencies between Seaborn's testimony and her recorded interview with law enforcement. Trial counsel emphasized that although "a central part of [the State's] case is the testimony of Kimberly Seaborn . . . [she] has said two things. She said, from the witness stand, she was high and she didn't see anything. Then she allegedly made a statement to Detective Coleman that she did see something." At the hearing on Gaston's motion for new trial, trial counsel testified that one of his trial strategies was to "argue in the end that the State hadn't met its burden" by pointing out inconsistencies in several witnesses' testimony. Trial counsel

---

[6] Q: Wasn't there things that [Seaborn] told you that made you realize that she didn't witness anything?
A: No. Other than she said that she heard the gunshots; she didn't see the person shoot.

23

testified that he saw Seaborn and other State's witnesses as "complete failures" who "destroyed themselves . . . when they got on the stand," and that he "[didn't] want to be the person with the bucket throwing water on them and putting them out." In light of counsel's assessment of Seaborn's credibility, trial counsel's decision to focus his cross-examination on witnesses other than Seaborn is exactly the kind of strategic and tactical decision trial counsel was empowered to make. See *Lawrence v. State*, 286 Ga. 533, 534 (2) (690 SE2d 801) (2010) (trial counsel's decision not to cross-examine a witness was reasonable trial strategy and did not amount to ineffective assistance). Absent a showing that the extent of such cross-examination was objectively unreasonable, Gaston cannot establish that his trial counsel performed deficiently. Because Gaston has failed to make such a showing, this claim of ineffective assistance fails. See *Jones v. State*, 296 Ga. 561, 565-566 (3) (769 SE2d 307) (2015).

*Judgment affirmed. All the Justices concur.*

DECIDED JANUARY 13, 2020.

24

Murder. Fulton Superior Court. Before Judge Brasher.

*Ross & Pines, Noah H. Pines, Andrew S. Fleischman*, for appellant.

*Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, F. McDonald Wakeford, Kevin C. Armstrong, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew D. O'Brien, Assistant Attorney General*, for appellee.