307 Ga. 680
FINAL COPY

S19A1148. SMITH v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Mary Katherine Smith was convicted of felony murder based on cruelty to children in connection with the death of her two-year-old son Mason Tucker Smith, who was known as Tucker. She contends that the evidence was insufficient to support her convictions and that the trial court erred by excusing a juror and by declining to give a jury instruction on her good character. We affirm.[1]

---

[1] The crimes occurred on July 30, 2014. On September 1, 2015, a Richmond County grand jury indicted Appellant for malice murder, felony murder based on first-degree cruelty to children (for maliciously causing cruel and excessive physical and mental pain to Tucker), felony murder based on aggravated assault, first-degree cruelty to children, and aggravated assault. Appellant was tried from August 15 to 19, 2016. The jury found her not guilty of malice murder and guilty of the other charges. The trial court sentenced Appellant to serve life in prison for felony murder based on cruelty to children and 20 consecutive years each for cruelty to children and aggravated assault. The court purported to merge the count for felony murder based on aggravated assault, although it was actually vacated as a matter of law. See *Malcolm v. State*, 263 Ga. 369, 371-372 (434 SE2d 479) (1993). Appellant filed a timely

1. (a) Viewed in the light most favorable to the verdict, the evidence presented at trial showed the following. In early July 2014, Appellant, her 15-year-old daughter Jamie Smith, and her son Tucker moved in with Jeremy Kitchens and Kitchens's parents. Kitchens had been Appellant's high school boyfriend, and they had reconnected about six months earlier. The children's father had died shortly after Tucker's birth, and Jamie was often the main caregiver for Tucker. On the morning of July 30, Appellant woke Jamie up and told her to get Tucker dressed and ready to go to day care. Tucker was enrolled in day care, although Appellant had stopped taking him regularly in recent months. Tucker vomited, however, so he stayed home with Jamie while Appellant, who was a hospice nurse, went to work. Before she left, Appellant used methamphetamine

motion for new trial and a motion to correct her sentence. On November 1, 2018, after a hearing, the trial court denied Appellant's motion for a new trial and granted her motion to correct her sentence. The court held that because the cruelty to children and aggravated assault counts merge into the felony murder conviction, Appellant's convictions and sentences for those merged crimes must be vacated, and Appellant's sentence should be corrected to reflect that she has been convicted only of one count of felony murder and sentenced to serve life in prison. Appellant filed a timely notice of appeal, and the case was docketed to the August 2019 term of this Court and orally argued on August 20, 2019.

with Kitchens. During the day, Jamie and Tucker watched television downstairs, while Kitchens, who was unemployed, stayed upstairs in the bedroom he shared with Appellant. Tucker threw up a couple more times after eating, but eventually he was able to keep down some bland food.

A little after 5:00 p.m., Appellant returned home. Jamie asked if she could spend the night at a friend's house, and Appellant agreed to drive Jamie there after making dinner. Appellant put food in the oven and went upstairs to her and Kitchens's bedroom, where Kitchens was sitting in his recliner. Jamie brought Tucker into the room to leave him with Kitchens while she showered. Tucker whined because he did not like being left with Kitchens. During the 30 to 45 minutes that Jamie was showering, Appellant or Kitchens became upset with Tucker and ordered him to stand in the corner. Appellant then went downstairs for a few minutes to check on the food, leaving Tucker in the corner. As Appellant was returning up the stairs, she heard a thump and Kitchens yelled that Tucker was having one of his "episodes." According to Appellant, Tucker had "breath holding

syndrome," and when he got upset, he would sometimes hold his breath until he passed out; during a more severe episode, his body would become rigid, like he was having a seizure.[2] Appellant found Tucker lying on the floor in the corner of the bedroom. Kitchens was still in his recliner. Both Appellant and Kitchens thought Tucker had hit his head on a cabinet near the corner. Appellant picked up Tucker and carried him to the bed. Kitchens saw her shake Tucker and slap him on the face trying to revive him.[3]

---

[2] Appellant had seen Tucker have only one other severe episode. She took him to the hospital but believed the doctors did not do anything to help Tucker, who recovered on his own. Several other witnesses, including Jamie and one of Tucker's day-care teachers, testified that they had seen Tucker hold his breath to the point of passing out. After an incident at day care, the teacher called 911. Tucker was conscious by the time the paramedics arrived, and when Appellant got to the day-care center, she said Tucker did not need to go to the hospital. The teacher testified that after this episode, she called Tucker's pediatrician and was told that there was no such thing as "breath holding syndrome." Another doctor testified at trial that although she had heard of children holding their breath when upset, she had never heard it called a "syndrome."

[3] Kitchens was interviewed three times by the lead investigator for this case. All three interviews were video-recorded and played for the jury at trial. In his first interview, Kitchens denied seeing Appellant shake or slap Tucker. In the second interview, Kitchens admitted seeing Appellant shake and slap Tucker, but said that both actions were very light. In the final interview, Kitchens said that Appellant slapped Tucker with so much force that the child would have been knocked down if he had been standing rather than lying on the bed. Kitchens testified at trial that Appellant shook Tucker; he was not asked if she slapped Tucker.

Appellant then went into the bathroom, where Jamie had just finished her shower, and wet a rag to rub on Tucker. Appellant told Jamie that Tucker had experienced another one of his breath-holding episodes and that he was okay but had hit his head on something. Appellant returned to Tucker with the rag. Jamie finished dressing and then went into the bedroom to check on Tucker; he was stiff and not responsive. Jamie then went into her bedroom to finish getting ready. Appellant sat with Tucker on the bed for a while, briefly leaving to fetch Kitchens a plate of food. Jamie returned to the bedroom and sat with Tucker for about an hour. Before she left, Tucker had become more responsive, but he seemed limp and was still lying down. Appellant or Kitchens put pillows around Tucker on the bed, and Appellant drove Jamie to her friend's house.

During the 30 to 40 minutes that Appellant was gone, Kitchens worked on building a trundle bed in Jamie and Tucker's bedroom until he heard Tucker, who was still on the bed in the other bedroom, throw up. As Kitchens began cleaning Tucker, Appellant returned.

Kitchens told her to "deal with this" and went to the bathroom to throw up in reaction to Tucker's vomit. Kitchens was in the bathroom for several minutes.[4] Appellant put an oxygen sensor on Tucker's finger. Soon his oxygen levels dropped dangerously low, and he began gasping for breath. Appellant called 911. When the paramedics arrived, Kitchens looked upset, but Appellant seemed "unnaturally calm" and had a flat affect. At the hospital, Appellant, who was still calm, told Kitchens that she loved him and she was sorry.

Upon his arrival at the hospital, Tucker was not arousable and his pupils did not react to light, indicating that he had severe brain damage. He had bruises on his mouth, face, and scalp, including one that looked like a handprint on his cheek.[5] Tucker had a large amount of bleeding in his brain and behind his eyes, and his brain

---

[4] During his interviews, Kitchens indicated at some points that he went to the bathroom and threw up after Tucker fell in the corner. At another point, however, Kitchens said that he remained in his recliner the entire time after Tucker fell until Appellant left. At trial, Kitchens testified that he stayed in his recliner and did not pay much attention to what Appellant did with Tucker after Tucker fell, because he was doing a crossword puzzle on his tablet.

[5] Scale photographs of Appellant's and Kitchens's hands were taken and admitted at trial, as well as a photograph of the bruise on Tucker.

was swollen. He was put on life support in intensive care. Three days later, he was taken off life support and died. Tucker had suffered rotational force injuries, meaning that his brain had moved in his skull, and blunt force trauma. Symptoms of these injuries, including lethargy, glazed eyes, loss of awareness, and difficulty breathing, would have been immediate. The medical examiner testified that this kind of trauma could not have been caused by a fall from standing height or from passing out; it required substantial force and likely came from a combination of a blow and shaking. She concluded that there was no plausible accidental cause for Tucker's injuries from the history given by Appellant or from the household environment where Tucker was injured. Doctors also found that Tucker had nine healing rib fractures, which were inflicted two to four weeks earlier; the injuries were consistent with being caused by forceful squeezing, not an accidental fall.

Jamie, Kitchens, and Appellant were interviewed by investigators from the Richmond County Sheriff's Office. The interviews were video-recorded and played for the jury. Jamie and

7

Kitchens, who were not charged with any crimes connected to Tucker's death, also testified at trial, giving testimony largely consistent with their interview statements; Appellant did not testify. Jamie, Kitchens, and Appellant all said that Tucker was usually punished by being told to stand in the corner and sometimes with a "pop" on his hand or diapered bottom, usually administered by Appellant but sometimes by Jamie or Kitchens. Kitchens said that a week or two before Tucker's death, he saw Appellant slap the child's head with the back of her hand hard enough to knock him down. Kitchens admitted that on one occasion, he had spanked Tucker on his bottom hard enough to bruise. Neither Kitchens nor Appellant could account for the rib fractures or any of Tucker's other severe injuries. Jamie said that sometimes when she returned after being gone for a few days, Tucker would have strange bruises that Appellant did not satisfactorily explain.

Kitchens testified that he did not seek help for Tucker sooner because Appellant seemed like she had the situation under control. Appellant claimed in her interview that she was not overly

concerned at first because until Tucker stopped breathing, his symptoms were the same as they had been in the prior serious breath-holding episode. Throughout her interview, Appellant remained certain in her position that Kitchens would not hurt Tucker. When Kitchens was asked at trial who hurt Tucker, he denied doing so and said, "I guess [Appellant] did."

(b)  Appellant argues that the evidence that she participated in the crimes was solely circumstantial and did not satisfy OCGA § 24-14-6, which says: "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." According to Appellant, the evidence did not exclude the reasonable hypothesis that Kitchens alone killed Tucker.

> Whether an alternative hypothesis raised by the defendant is "reasonable" is a question committed principally to the jury, and where the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of the guilt of the accused, we will not disturb that finding unless it is insupportable as a matter of law.

9

*Brown v. State*, 301 Ga. 728, 731 (804 SE2d 16) (2017) (citation and punctuation omitted).

The jury heard evidence that Appellant forcefully shook and slapped Tucker close to the time that he became stiff and unresponsive. Despite those symptoms and other serious symptoms that Tucker would have exhibited immediately after the fatal injuries, such as glazed eyes and difficulty breathing, Appellant, who is a nurse, did not immediately seek help for her child. Once she finally did get help, she did not seem upset, and she apologized to Kitchens at the hospital. Appellant also apparently did not seek medical help for Tucker when his ribs were fractured by a forceful squeezing two to four weeks before his fatal injuries, and Jamie had seen other unexplained injuries on Tucker when he was left in his mother's care. In addition, Appellant's theory that Kitchens killed Tucker was undermined by her certainty during her interview that Kitchens would not hurt Tucker, and his trial testimony that he had not harmed the child and that she must have done so. Viewed as a

whole, this evidence was sufficient for the jury to reject as unreasonable the hypothesis that Kitchens alone killed Tucker and instead to find that Appellant was responsible. See *Virger v. State*, 305 Ga. 281, 286-287 (824 SE2d 346) (2019); *Gomez v. State*, 301 Ga. 445, 452 (801 SE2d 847) (2017).[6]

While not strong, the evidence also was legally sufficient as a matter of constitutional due process, as a rational jury could conclude from the evidence presented that Appellant was guilty beyond a reasonable doubt of felony murder based on cruelty to children. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

---

[6] Appellant argues that Kitchens was consistently in the room with Tucker during the time when Tucker suffered his fatal injuries. Even if the jury believed that Kitchens was involved in Tucker's death, however, given the evidence supporting Appellant's culpability, the jury reasonably could have rejected the hypothesis that Kitchens acted alone and instead found that Kitchens and Appellant were both responsible. See OCGA § 16-2-20 (defining parties to a crime); *Virger*, 305 Ga. at 288-290.

2. Appellant argues that the trial court abused its discretion when it dismissed a juror and replaced her with an alternate on the second day of the trial. We disagree.

Juror A. H. and an alternate juror arrived late on the first day of the trial after the jury was selected, delaying the proceeding by 35 minutes. The court did not specifically admonish Juror A. H. or the tardy alternate juror, but it did remind the jurors to arrive promptly at 9:00 a.m. during the trial. At 9:06 a.m. on the next day, the prosecutor informed the court that Juror A. H. was late again. The prosecutor also noted that the juror had been sleeping during a large portion of the trial the day before. The court said that although it had not noticed Juror A. H. sleeping, several other jurors had told the bailiffs about her sleeping. The prosecutor moved to strike her; Appellant objected. The court said, "We'll give her a few more minutes and kind of see how she does today," noting that it had been considering dismissing the juror sua sponte before the State made its motion.

After more discussion, the court said, "[I]t's a quarter after

9:00. Juror [A. H.], as reported by the jury clerk, has contacted the office and said that she's going to be on her way but since she's 15 minutes late right now, that's as much time as we're going to give [her]." The court removed Juror A. H. and replaced her with an alternate. Appellant again objected. The jury was then brought into the courtroom, and the trial resumed.[7]

"It is well established that OCGA § 15-12-172 gives a trial court the 'discretion to discharge a juror and replace him or her with an alternate at any time so long as the trial court has a sound legal basis.'" *Rivera v. State*, 282 Ga. 355, 361-362 (647 SE2d 70) (2007) (citation omitted). See also OCGA § 15-12-172 (providing that if a juror "dies, becomes ill, [or] upon other good cause shown to the court is found to be unable to perform [her] duty, . . . the first alternate juror shall take [her] place"). Juror A. H. was late for the first day of the trial. She was again late for the second day, even after the court

---

[7] When Juror A. H. arrived at the courthouse around 9:25 a.m., she was taken into custody; later that day, the trial court held a show cause hearing for her to explain the reason for her tardiness. She said that she relied on her boyfriend for transportation and the boyfriend had to take his brother to school in the morning. The court did not hold Juror A. H. in contempt.

13

had reminded the jury to be punctual. It was not an abuse of discretion for the court to conclude that waiting for Juror A. H. to arrive would unnecessarily delay the trial and that replacing her with an alternate juror was appropriate. See *Rivera*, 282 Ga. at 361-362 (holding that the trial court did not abuse its discretion by dismissing a juror who was 30 minutes late returning from lunch due to an ongoing hardship arranging child care). See also *Brooks v. State*, 281 Ga. 14, 18 (635 SE2d 723) (2006) (holding that trial counsel did not perform deficiently by not objecting to a juror's dismissal because "[t]he juror's tardiness was a sound basis for her dismissal"); *Herring v. State*, 224 Ga. App. 809, 810-812 (481 SE2d 842) (1997).[8]

3. Finally, Appellant argues that she was entitled to a jury instruction on good character based on testimony about her treatment of her children. Again, we disagree.

---

[8] Although the trial court may have suggested that it was considering dismissing Juror A. H. based on information that she had been sleeping during the first day of the trial, because the actual dismissal of Juror A.H. was based on her tardiness, we need not decide if the juror's alleged sleeping also would have been a valid ground for dismissing her.

Appellant's adult son testified that he and Appellant had a "very good relationship" and that she was his "go-to person." He also said that Appellant had "never laid a finger" on him when disciplining him. Appellant's mother, Kitchens, and Jamie testified that they had never seen Appellant physically abuse her children, although she would sometimes spank them. Based on this testimony, Appellant submitted a request for the following jury instruction:

> You have heard evidence of the (character of the defendant) (character of the defendant for a particular trait, more specifically _____) in an effort to show that the defendant likely acted in keeping with such character or trait at pertinent times or with reference to issues in this case. This evidence has been offered in the form of (opinion of (an) other witness(es)), (reputation) (specific instances of conduct of the defendant showing such trait). You should consider any such evidence along with all the other evidence in deciding whether or not you have a reasonable doubt about the guilt of the defendant.[9]

[9] OCGA § 24-4-404 (a) (1) authorizes the admission of "[e]vidence of a pertinent trait of character offered by an accused[.]" OCGA § 24-4-405 explains how this sort of evidence may be introduced:

> (a) In all proceedings in which evidence of character or a trait of character of a person is admissible, proof shall be made by testimony as to reputation or by testimony in the form of an opinion.
>
> (b) In proceedings in which character or a trait of character

15

Appellant argued that the trait that had been proven was her character of "being a good mother." The State responded that there had not been any evidence presented to support this instruction. The trial court declined to give the charge.

On appeal, Appellant gives her good character argument a new twist. She no longer argues that the jury should have been instructed about her character trait of "being a good mother" generally. She now identifies two other character traits — peacefulness and temperance — that she believes the jury should have been told to consider. Because Appellant did not request an instruction on those traits at trial, our review of the trial court's failure to give such an instruction is limited to plain error. See OCGA § 17-8-58 (b); *Jackson v. State*, 306 Ga. 69, 85 (829 SE2d 142) (2019).[10] "To show plain error, Appellant must demonstrate that the

---

of a person is an essential element of a charge, claim, or defense or when an accused testifies to his or her own character, proof may also be made of specific instances of that person's conduct. . . . .

[10] Even if we construed Appellant's request at trial for a good-character instruction based on her "being a good mother" as raising the claim she now

16

instructional error was not affirmatively waived, was obvious beyond reasonable dispute, likely affected the outcome of the proceedings, and seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Thornton v. State*, 307 Ga. 121, 124 (834 SE2d 814) (2019) (citation and punctuation omitted).

We need not decide whether it was obvious legal error for the trial court not to give an instruction sua sponte on Appellant's peacefulness or temperance (although we doubt it), "because we have no doubt that a good character instruction would not have changed the outcome of Appellant's trial." *Jackson*, 306 Ga. at 87. The jury heard the evidence to which Appellant now points as demonstrating her peacefulness and temperance — that she "never

---

makes, we would still review this enumeration only for plain error, because she did not object to the omission of the instruction after the jury was charged. See OCGA § 17-8-58 (a); *Reed v. State*, 304 Ga. 400, 405 (819 SE2d 44) (2018).

Appellant argues that if we conclude that her claim was not preserved for ordinary appellate review, we should consider whether her trial counsel provided ineffective assistance by not objecting after the jury charge. Appellant cannot raise an ineffective assistance of trial counsel claim in this appeal, however, because she is represented by the same attorneys who represented her at trial. See *Robinson v. State*, 306 Ga. 614, 616 (832 SE2d 411) (2019) (explaining that the defendant's first opportunity to raise a claim of ineffective assistance of trial counsel is when she is no longer represented by trial counsel).

laid a finger" on one of her children and sometimes spanked but did not physically abuse others. The jury also heard Kitchens's statement that Appellant had slapped Tucker hard enough to knock him down a week or two before his death and Jamie's testimony that Tucker got strange bruises when he was left in Appellant's care. The jury was instructed to "giv[e] consideration to all the facts and circumstances of this case" and "determine the facts of the case from all of the evidence presented." It is unlikely that the jury would have reached a different result if it had been expressly told that it could consider the nebulous and somewhat conflicting evidence of Appellant's peacefulness or temperance. See id.

*Judgment affirmed. All the Justices concur.*

DECIDED JANUARY 27, 2020.
Murder. Richmond Superior Court. Before Judge Annis.
*Henry N. Crane III, Danny L. Durham*, for appellant.
*Natalie S. Paine, District Attorney, Joshua B. Smith, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Elizabeth H. Brock, Assistant Attorney General*, for appellee.