309 Ga. 721
FINAL COPY

S20A0785. LONG v. THE STATE.

Nahmias, Presiding Justice.

Appellant Jennifer Long was convicted of malice murder and first-degree child cruelty in connection with the death of her 18-month-old daughter, Alexis Long. Appellant contends that the evidence was insufficient to support her convictions and that her trial counsel provided ineffective assistance. We affirm.[1]

1. (a) Viewed in the light most favorable to the verdicts, the evidence presented at Appellant's trial showed the following. After they could not conceive a child, Appellant and her husband, Timothy

---

[1] The crimes occurred on January 29, 2012. In May 2014, a Muscogee County grand jury indicted Appellant for malice murder, cruelty to children in the first degree, and felony murder based on first-degree child cruelty. Appellant was tried from December 7 to 11, 2015. The jury found her guilty of all counts. The trial court sentenced Appellant to serve life in prison without parole for malice murder and 20 concurrent years for child cruelty. The felony murder count was vacated by operation of law, although the court said that it "merged." Appellant filed a timely motion for new trial, which she amended through new counsel in March 2019. After a hearing, the trial court denied the motion in November 2019. Appellant filed a timely notice of appeal, and the case was docketed to the April 2020 term of this Court and submitted for a decision on the briefs.

Long, worked with the Division of Family and Children Services (DFCS) to adopt a child. Alexis was born in June 2010, and came to live with the Longs in Columbus around June 2011, after her biological mother died and her biological father surrendered his parental rights. Between June and November, DFCS case managers visited the Longs' home about every two weeks to check on Alexis, and the Longs took her for regular checkups by her pediatrician. The Longs adopted Alexis in November 2011. After that, DFCS stopped its visits, and the Longs missed Alexis's scheduled 90-day pediatrician checkup in January 2012.

Timothy, who pled guilty to second-degree child cruelty and agreed to testify for the State in exchange for a reduced sentence, testified as follows.[2] On the morning of January 29, 2012, Appellant fed Alexis breakfast and got her dressed, and the family drove together to a church in Griffin where Timothy was a guest preacher.

---

[2] A person commits first-degree child cruelty when he or she "maliciously causes a child under the age of 18 cruel or excessive physical or mental pain." OCGA § 16-5-70 (b). A person commits second-degree child cruelty when he or she "with criminal negligence causes a child under the age of 18 cruel or excessive physical or mental pain." Id. at (c).

On the way there, Alexis was happy and slept a little in the car. After the service, the family had lunch with church members; Alexis ate and played around the church. On the way home, Alexis became a little fussy. When they got home and Appellant took Alexis out of her car seat, Alexis had a tantrum, and Appellant took the child into the house to change her diaper.

Timothy did not follow Appellant into the house immediately because, as he was walking inside, he realized that he had a pair of glasses that he normally left in the car in his pocket, so he went to put them back. While he was at the car, he heard a loud noise that sounded like furniture being moved; the noise seemed to come from the direction of Alexis's room but could have come from a nearby neighbor's house. When Timothy went into his house, he asked Appellant if she had heard a noise; she said no, but that there was something wrong with Alexis. Alexis was lying on the floor of her room, and it looked like she had vomit in her mouth. When Timothy sat her up, she threw up. She was breathing heavily, looked droopy, and was unresponsive to her name. He called 911 and started doing

CPR. He described Alexis's condition to the dispatcher, and the dispatcher told him to stop CPR because she could hear Alexis breathing. EMTs arrived soon after and took Alexis to a Columbus hospital. Timothy and Appellant followed.

The doctor who treated Alexis when she arrived at the hospital testified that her pupils did not react well and she was minimally responsive to painful stimuli. A CT scan of Alexis's head showed that she had a subdural hematoma. She was stabilized and transferred to Egleston Children's Hospital in Atlanta. Shortly after she arrived there, she was put on a ventilator. Alexis was determined to be brain dead the next day, and she was taken off the ventilator; she died the day after that. The medical examiner determined that Alexis's cause of death was blunt force trauma to the head. Significant trauma to Alexis's head caused a large amount of blood to collect inside her head and her brain to swell; she also had bleeding inside her eyes. In addition, Alexis had multiple bruises all over her body, which were varying colors, indicating that they were different ages.

On the evening after Alexis was taken to the hospital, with

Timothy's consent, police officers searched the Longs' house. They found and photographed a broken wooden changing table in Alexis's room. The table's support arm and padded top surface were broken, a broken piece was still attached to the top surface, another piece was lying on the floor, and small wood chips from the table were on the floor and in a storage basket on the lower shelf. Hangers and a box of "Scar Zone Bruise Cream" were lying on top of the changing table pad. Two more boxes of bruise cream were on a table in the living room.

Appellant and Timothy were interviewed by Columbus police officers at the hospital soon after Alexis was brought in and again at the police station the next day. At the hospital, Timothy gave an account similar to the one described above, although he did not mention hearing a noise while he was at the car. Appellant gave the following account. On the way home from the church, Alexis was a little fussy; Appellant thought that she might have been hungry. As they got closer to the house, Alexis began to cry more loudly. When they got home, Appellant took Alexis out of the car seat and into

Alexis's room, where she sat Alexis on the ground in "timeout." She did not leave Alexis in the room unattended. At some point during the timeout, Alexis went limp and her eyes partially closed. Appellant placed her hand on Alexis's head and side and eased Alexis down to the floor. Appellant called for Timothy, who was bringing things in from the car. Timothy picked up Alexis, who had vomit coming out of her mouth, called 911, and performed CPR on Alexis. Appellant said that Alexis had several bruises because Alexis fell a lot and that she had bought bruise cream to help heal the bruises. The interviewing officer testified that Appellant spoke as if she were talking about an object and not a child and that she was "callous" and emotionless both during the interview and when she was allowed to see Alexis.

At the police station the following day, Timothy repeated the story he had given at the hospital, but added that he had heard a noise like furniture being moved while he was back at the car.[3]

---

[3] At trial, Timothy explained that after the first interview he had been thinking very hard, trying to remember every little detail about the incident,

Timothy also said that about two or three weeks before the fatal incident, Appellant told him that a main support piece of Alexis's changing table had broken. He described the support as a single piece of wood that came across beneath the changing surface. Timothy said that they had been using the changing table only to store diapers and were changing Alexis on the floor.

At the police station, Appellant initially repeated the story that she had told at the hospital. However, near the end of the three-hour interview, Appellant said that she put Alexis onto the changing table (rather than on the ground). A few minutes later, Appellant said that she threw Alexis onto the changing table, and when she did so, the table made a loud sound and Alexis stopped crying.

Dr. Stephen Messner, a child abuse pediatrician, was asked to consult on Alexis's case on the day after she arrived at Egleston Hospital. Dr. Messner gave the following testimony about Alexis's injuries. Alexis's scalp had some areas of very thin hair, as well as

---

and that he remembered the noise when he was being questioned at the police station. He said that when he was at the hospital, he had been more concerned about what was going on with Alexis.

hairs of different lengths, which indicated trauma, such as the hair being pulled and broken. There were some short, curved scabs and swelling on the back of her head. Alexis had a bruise within her ear, which was unlikely to be accidental and was indicative of trauma. Alexis had a number of retinal hemorrhages, which indicated significant trauma, such as a high-speed motor vehicle crash or falling multiple stories. Alexis had fluid underneath the skin on the back of her head, and significant swelling of the brain, which indicated that she had a brain injury. These injuries must have been sustained a short time before she was taken to the hospital, because someone with this type of head injury would not be able to walk, run around, eat, or interact as Alexis had done at the church. Alexis's parents did not report any accidental trauma that would have caused such severe head injuries, and the injuries were not consistent with a toddler who was tossed about a foot onto a padded changing table.

Alexis also had various bruises on her forehead, cheek, arms, sternum, thighs, shins, and back of her legs. Many of these bruises

were not consistent with typical toddler bruises caused by tripping and falling. Alexis also had rectangular bruises on her chest and legs, indicative of being struck by an object of the same shape. In addition, Alexis had some linear bruises, consistent with being struck by a long object such as a clothes hanger. Overall, Alexis's injuries indicated an ongoing pattern of abuse in the household.

Dr. Messner spoke with Timothy, Appellant, and Alexis's maternal grandmother. Dr. Messner showed the grandmother photos of the visible injuries on Alexis's face, and she said that those bruises were not present when she saw Alexis at the church. When Dr. Messner showed Timothy photos of many of Alexis's bruises, Timothy said that he had not seen them before.[4] When Dr. Messner showed Appellant the photos, she said she had never seen those bruises before but that she recognized one bruise on Alexis's leg which may have been from when Alexis fell one or two weeks before.

---

[4] At trial, Timothy testified that he bathed or changed Alexis only once in a while and that Appellant was always home with Alexis while he was at work. He said that any time he saw a new bruise on Alexis, Appellant attributed it to a fall. He added that Alexis did fall and bump into things a lot, because she had just learned how to walk and run.

Appellant also said that Alexis fell a lot. When Dr. Messner told Timothy that Alexis had suffered blunt force trauma to the head, Timothy said that he had no idea how it happened. When Dr. Messner told Appellant that Alexis was going to die from her injuries, Appellant said, "I hate to hear that"; her demeanor was "flat" and emotionless.

Dr. Messner visited and took screenshots of Appellant's Facebook page on January 30. One photo that Appellant posted in December 2011 shows some bruises on the side of Alexis's forehead and cheek. Dr. Messner testified that these bruises were not accidental injuries because they were on fleshy parts of the child's face. On January 4, 2012, Appellant posted, "my child has one bad temper . . . she thru [sic] a tantrum yesterday evening," and later commented, "[h]er tantrums don't last long after Tim punishes her." Another photo, posted nine days before the fatal incident, shows bruising on the side of Alexis's face underneath her right eye and some hair loss at the top of her head. Appellant wrote a comment on another photo from the same date that said, "[S]he fell and has a

couple scratches on her face."

At trial, Appellant called seven witnesses to testify regarding her character: her mother and father, who live in Griffin; her sister, who lives in Lawrenceville; her aunt and grandmother, who live in Michigan; and two long-time family friends, who live in Griffin. The character witnesses generally testified that Appellant was gentle, soft-spoken, a loving mother, and a nonviolent person. Appellant's aunt and grandmother acknowledged that they lived in Michigan while Appellant was growing up in Griffin and only saw Appellant about once a year. Appellant's grandmother further acknowledged that she had never met Alexis.

Appellant also testified at trial, giving a modified version of the final story she told during her interview at the police station. She claimed that when she and Alexis went in the house after returning from church, Alexis walked into her room on her own, and Appellant then sat her on the changing table. When Appellant turned around to get some clothes for Alexis, Alexis fell off the changing table onto the hardwood floor. Appellant acknowledged that she did not

mention this fall in either of her interviews. She said that she had been confused and did not want to admit that she put Alexis on the broken changing table. Appellant admitted on cross-examination that one of the reasons she did not take Alexis to her pediatrician after her October 2011 checkup was because Appellant knew the doctor would suspect child abuse.

(b) Appellant argues that the evidence presented at her trial was circumstantial and insufficient under OCGA § 24-14-6 to support her convictions. OCGA § 24-14-6 says, "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." However,

> [w]hether an alternative hypothesis raised by the defendant is "reasonable" is a question committed principally to the jury, and where the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of the guilt of the accused, we will not disturb that finding unless it is insupportable as a matter of law.

*Smith v. State*, 307 Ga. 680, 684 (838 SE2d 321) (2020) (citation and

punctuation omitted).

Appellant asserts that the evidence did not exclude the reasonable hypothesis that Timothy killed Alexis. Although the evidence did not show exactly how Alexis's fatal injuries were inflicted, Timothy said consistently that he was out by the car at the time those injuries occurred, whereas Appellant admitted that she was alone in the room with Alexis and changed her story about what she did to Alexis several times, each time giving an account that was dubious in light of the physical and medical evidence. Viewed as a whole, the evidence was sufficient for the jury to reject as unreasonable the hypothesis that Timothy killed Alexis and instead to find that Appellant was responsible. See, e.g., *Smith*, 307 Ga. at 685. See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

Appellant also argues that the evidence was insufficient as a matter of constitutional due process for a rational jury to find that

she was guilty beyond a reasonable doubt of malice murder and cruelty to children because the jury should not have believed Timothy and the evidence about the broken changing table was not significant. But as we have explained many times, when evaluating the sufficiency of the evidence, "[w]e do not resolve conflicts in the evidence or determine the credibility of witnesses; instead, we view the evidence in the light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." *Chavez v. State*, 307 Ga. 804, 806 (837 SE2d 766) (2020) (citation and punctuation omitted). Viewed in this way, the evidence presented at trial and summarized above was constitutionally sufficient. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); *Smith*, 307 Ga. at 685; *Virger v. State*, 305 Ga. 281, 286 (824 SE2d 346) (2019); *Gomez v. State*, 301 Ga. 445, 452 (801 SE2d 847) (2017).[5]

---

[5] In this case, Appellant argues that the evidence was constitutionally insufficient. But we remind litigants that this Court will end its practice of considering the sufficiency of the evidence sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020.

2. Appellant argues that her trial counsel provided ineffective assistance by failing to object to the State's improper closing argument and by presenting an unreasonable defense theory to the jury. To succeed on these claims, Appellant must establish that her counsel's performance was professionally deficient and that she suffered prejudice as a result. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To show deficient performance, Appellant must show that counsel performed "in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Gaston v. State*, 307 Ga. 634, 636 (837 SE2d 808) (2020) (citation and punctuation omitted). To show prejudice, Appellant must show "a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different." Id. We need not address both parts of this test if Appellant makes an insufficient showing on one. See *Lupoe v. State*, 300 Ga. 233, 240 (794 SE2d 67)

See *Davenport v. State*, 309 Ga. 385, 399 (846 SE2d 83) (2020). This Court began assigning cases to the December term on August 3, 2020.

(2016).

(a) Appellant argues that her trial counsel should have objected during the State's closing argument when the prosecutor questioned why Appellant called as character witnesses relatives and friends who did not live in Columbus or have regular interactions with her, rather than people who may have had more frequent and recent interactions with her, such as her minister, boss, co-workers, and Facebook friends. This argument, however, was permissible because "'the prosecutor may properly draw inferences in his argument from the nonproduction of witnesses.'" *McGee v. State*, 260 Ga. 178, 178 (391 SE2d 400) (1990) (citation omitted). See also *Isaac v. State*, 263 Ga. 872, 874 (440 SE2d 175) (1994) (holding that the prosecutor's closing argument about the appellant's choice of character witnesses, including observing that he did not call certain people such as his unit commander and chaplain, was permissible because "a prosecutor may draw inferences in his argument from the nonproduction of witnesses"). "Because the prosecutor's comments during closing arguments were within the bounds of permissible

argument, trial counsel's failure to make a meritless objection to the State's closing argument is not evidence of ineffective assistance." *Gaston*, 307 Ga. at 640 (citation and punctuation omitted).

(b) Appellant also argues that the defense theory presented by her counsel at trial was so unreasonable that it constituted ineffective assistance. At the request of Appellant's counsel, the jury was instructed on the law of accident and involuntary manslaughter, and counsel highlighted both concepts in his opening statement and closing argument. Counsel also pointed to Timothy as the most likely perpetrator of Alexis's ongoing abuse, highlighting the testimony about Appellant's good character and the fact that Timothy entered a plea deal to avoid more serious punishment.

Appellant argues that her trial counsel should have done more medical research to allow a better theory to be presented to the jury. However, Appellant has not demonstrated what further medical investigation would have revealed or articulated the supposedly

superior defense theory that counsel should have pursued.[6] Thus, Appellant has failed to establish prejudice. See *Lupoe*, 300 Ga. at 241 ("To show prejudice on a claim that trial counsel failed to adequately investigate the case, [the appellant] had to at least make a proffer as to what additional investigation would have uncovered, and not merely speculate that such information exists and would have made a difference." (citation and punctuation omitted)).

*Judgment affirmed. All the Justices concur.*

Decided September 8, 2020.

Murder. Muscogee Superior Court. Before Judge Mullins.
*Lindsey M. Brown*, for appellant.
*Julia F. Slater, District Attorney, George E. Lipscomb II, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.

---

[6] Appellant requested additional time after the hearing on her motion for new trial to submit a supplemental affidavit from a pediatric neuroradiologist. Although the trial court granted Appellant one month to submit the affidavit, Appellant never filed it.