310 Ga. 869
FINAL COPY

S20A1196. GIALENIOS v. THE STATE.

Boggs, Justice.

After a 2019 jury trial, Robert Derek Gialenios was convicted of malice murder and possession of a firearm during the commission of a felony arising out of the shooting death of Bryan Overseth, the husband of Gialenios' mistress. His amended motion for new trial was denied, and he appeals, asserting seven enumerations of error. For the reasons stated below, we affirm.[1]

---

[1] The crimes occurred on January 21, 2017. On April 11, 2017, a Cherokee County grand jury indicted Gialenios for malice murder, felony murder, aggravated assault, possession of a firearm during the commission of a felony, stalking Kerri Overseth, and loitering and prowling on the property of Kerri Overseth's sister, Jennifer Grady. The stalking and loitering-and-prowling charges were severed, and after a trial from January 28 to February 7, 2019, a jury found Gialenios guilty of all remaining charges. The trial court sentenced Gialenios to life imprisonment without the possibility of parole for murder and five years to be served consecutively for the firearms charge. The trial court merged the aggravated assault count into the malice murder count and purported to merge the felony murder count into the malice murder count as well, although the felony murder count was actually vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993). An order of nolle prosequi was entered on the stalking and loitering-and-prowling charges. New counsel filed a motion for new trial on February 15, 2019, which he amended on March 11, 2019. After a hearing on March 12, 2020, the motion

1. (a) Construed in the light most favorable to the jury's verdicts, the evidence presented at trial showed that Overseth and his wife, Kerri, were married for 16 years. Gialenios and Kerri met online while the Overseths were living in Montana, where they had recently moved from Georgia. Gialenios and Kerri established a long-distance romantic relationship, calling or texting on an almost daily basis. After Kerri's father suffered a stroke, she returned to Georgia in July 2016 to stay with him for about ten days at his home in a large subdivision in Holly Springs. She met Gialenios in person for the first time on the night she arrived, and the relationship became sexual after she let him into her father's home through a window.

Thereafter, Gialenios met Kerri almost every night while she was in Georgia, parking his white Toyota 4Runner at a Mexican restaurant a few blocks from her father's house and walking with Kerri through the neighborhood and on trails surrounding the

was denied on March 27, 2020. Gialenios filed a timely notice of appeal on April 7, 2020, and the case was docketed in this Court to the August 2020 term and orally argued on September 17, 2020.

2

nearby lake. Gialenios was carrying several guns whenever he met Kerri, and he told her that he "always carries. He never is without his guns." Kerri confided in Gialenios that she was unhappy in her marriage, and Gialenios told her that if she slept with Overseth again, he would kill them both. When Kerri said she was returning to her family in Montana, Gialenios was angry and sent her multiple messages demanding that she stay, even after she was on the flight home.

Gialenios repeatedly told Kerri that she "deserved better" and urged her to leave her husband, and he sent Kerri and her children gifts. Kerri's adult son, Brendan, discovered the affair through social media and spoke with Gialenios, who told the son that he and Kerri were in love and tried to enlist his sympathy. In November, Kerri told Gialenios that she was pregnant, and he became angry because it meant she had sex with Overseth despite his earlier threat to kill them both.

In December 2016, the Overseths came to visit Kerri's family in Georgia for the holidays. Overseth stayed with Kerri's father so

3

that he could work remotely without interruption, and the family dog stayed there as well, while Kerri and the children stayed at her sister's house in Canton. Gialenios visited the sister's house frequently to continue the affair, sometimes appearing "unwanted and uninvited" and banging on the windows.

On Friday, January 20, 2017, Kerri told Gialenios that she was planning on returning to Montana with her husband and children. They met that night, and Kerri again told Gialenios that she would be leaving; he texted her repeatedly that something was "in the way" of their affair. On Saturday, January 21, the day of the murder, they communicated frequently by phone and text, and Gialenios texted her: "It's a good thing you and I, it's us, Babe. It's all us." He also texted her that "s**t that holds you back, I will remove. . . ." They last spoke shortly after 8:00 p.m. Gialenios also sent a text that day to a friend in reference to Kerri stating: "She is all mine. I got my Queen."

That evening, Overseth returned from dinner and, while talking to Kerri on the phone, remarked that a large brick was

4

sitting in her father's driveway. Kerri testified that she was suspicious that Gialenios had something to do with it and had "gone to confront" her husband; she attempted to text and call Gialenios, but his phone went to voicemail. According to cell phone records later obtained by means of a search warrant, Gialenios' cell phone was located close to a nearby Cherokee County cell tower multiple times between 7:40 p.m. and 9:04 p.m., and at around 10:00 p.m., an employee of the nearby Mexican restaurant saw a white Toyota 4Runner parked beside the dumpster in the restaurant parking lot, with a male occupant.

Shortly after 10:00 p.m., Overseth left the house to walk the dog and did not return. At about 10:30 p.m., Kerri's father's next-door neighbor heard a single loud bang. Eventually, concerned that his son-in-law had not returned, her father went out to look for Overseth and found him lying by the side of the access road behind the house. The father tried to find a pulse, but could not, and he ran to the next-door neighbor's house and told him, "My son-in-law's lying out in the road. I think he's dead." At 10:41 p.m., the neighbor

called 911, and police and EMTs responded but were unable to revive Overseth, who had a bullet wound in his forehead. Police found Overseth's wallet, keys, and cell phone on his person. An expended Federal brand .22-caliber shell was found near his feet.

When police informed Kerri of her husband's death and asked if she knew of anyone who wanted to harm him, she immediately gave them Gialenios' name, although she did not know his address and had only his cell phone number. Police investigators located Gialenios the following day, and when interviewed, he gave evasive answers, saying that he did not recall if he was in Cherokee County the previous evening.

During Overseth's burial service, held on January 28, 2017, Gialenios showed up uninvited at the cemetery with what appeared to be dead flowers, and even though relatives told him to leave, he did not leave right away. On the night of February 1, Gialenios entered the back yard of Kerri's sister's house and left a package addressed to Kerri on the basement terrace. The package contained two Hallmark cards, a love note, a rose, a Publix receipt, and a note

with a time and place for a movie. The family called the police, who located Gialenios at a nearby gas station. Gialenios admitted to a police officer that he had entered the sister's back yard and left the package there; he was arrested for stalking, and later for murder.

The medical examiner testified that the cause of death was a single contact gunshot wound to the head. A firearms examiner testified that the bullet, which was recovered from Overseth's head, was a .22-caliber bullet consistent with being fired from a Walther P22 pistol. Police learned from Gialenios' ex-wife that he owned a .45-caliber Kimber pistol and a .22-caliber Walther P22 pistol; a firearms dealer testified that he sold Gialenios both firearms and a box of Federal brand .22-caliber ammunition. The Kimber pistol was recovered, but the Walther pistol was never found despite an extensive search. After Gialenios' ex-wife told the police that they used to shoot both pistols from the back deck at their former home, the police searched the deck area of that home and recovered three expended Federal brand .22-caliber shells. A Georgia Bureau of Investigation firearms examiner testified that two of the shells were

7

too corroded for him to determine any significant individual characteristics, but that the third shell and the shell recovered at Overseth's feet were fired from the same pistol.

(b) Gialenios contends that the evidence was insufficient to support his conviction, because the State's case was based solely on circumstantial evidence and failed to exclude all reasonable hypotheses of innocence under OCGA § 24-14-6.

> However, whether an alternative hypothesis raised by the defendant is "reasonable" is a question committed principally to the jury, and where the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of the guilt of the accused, we will not disturb that finding unless it is insupportable as a matter of law.

(Citation and punctuation omitted.) *Long v. State*, 309 Ga. 721, 726 (1) (b) (848 SE2d 91) (2020). "Not every hypothesis is reasonable, and the evidence does not have to exclude every conceivable inference or hypothesis; it need rule out only those that are reasonable." *Akhimie v. State*, 297 Ga. 801, 804 (1) (777 SE2d 683) (2015).

First, Gialenios asserts that the State's evidence did not

8

exclude the hypothesis that Overseth was murdered by one of two other men with whom Kerri had exchanged sexual text messages in the past. But the evidence showed that one of those men lived in Montana, and nothing indicated that he had ever traveled to Georgia. The other man with whom Kerri had exchanged text messages lived in Cherokee County, but he had only met Kerri once at a grocery store in Canton over a year before the murder, and no evidence was presented of a physical relationship. Gialenios' second hypothesis is that Overseth may have been shot by an unidentified person who was seen by another subdivision resident behaving suspiciously on the night of the murder. But no evidence connected this unidentified person to the crime or to the area of the subdivision in which Kerri's father lived.[2]

In contrast, evidence was presented that Gialenios was well acquainted with both Kerri's father's house and the surrounding area as he had been there on a daily basis, his vehicle was seen

---

[2] That witness' home was slightly over a mile and a half from the crime scene, on the far side of two lakes, and near the opposite end of this large subdivision of approximately 2,000 homes.

parked nearby on numerous occasions, including on the night of the murder, and his cell phone "pinged" off a nearby tower approximately one hour before the murder. And not only did Gialenios have a longstanding emotional and physical relationship with Kerri, he tried to persuade her to leave her husband, threatened to kill both her and her husband, and continued to press his attentions on her after her husband's murder, arriving uninvited at the burial service and leaving her flowers and an invitation to a date in the middle of the night less than two weeks after the murder. Finally, the fatal bullet was fired from the same .22-caliber pistol that Gialenios shot from the deck at his former home.

Viewed as a whole, this evidence was sufficient to enable the jury to reject either of the hypotheses proposed and to determine instead that Gialenios killed Overseth. "It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (Citation and punctuation omitted.) *Long*, 309 Ga. at 726-727 (1) (b). The evidence presented at trial and summarized above also was sufficient as a

matter of constitutional due process to enable a rational trier of fact to conclude beyond a reasonable doubt that Gialenios was guilty of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. Gialenios enumerates as error the trial court's denial of his motion to suppress his cell phone records, including cell site location information ("CSLI"), contending that the records were obtained in violation of *Carpenter v. United States*, 585 U. S. ___ (138 SCt 2206, 201 LE2d 507) (2018).[3] In accordance with this Court's recent decision in *Lofton v. State,* 310 Ga. 770, 781 (2) (__ SE2d __) (2021), we conclude that this contention is meritless under the facts presented here.

In reviewing a ruling on a motion to suppress, we review

---

[3] As we noted in *Lofton v. State*, 310 Ga. 770, 781 (2) (854 SE2d 690) (2021),  the United States Supreme Court held in *Carpenter* that "accessing seven days of CSLI constitutes a Fourth Amendment search," *Carpenter*, 585 U. S. at ___ (III) & n.3 (138 SCt at 2217); *Lofton*, 310 Ga. at 781 (2). However, as we also noted in *Lofton*, *Carpenter* was narrowly decided: it addressed "government-compelled production of cell phone records under 18 USC § 2703 (c) (1) (B) and (d)," not "a request under 18 USC § 2702 (c) (4) for the voluntary disclosure of records to address an emergency." *Lofton*, 310 Ga. at 781 (2). Moreover, *Carpenter* expressly declined to consider whether Fourth Amendment scrutiny applied to CSLI obtained for a shorter period of time. See *Carpenter*, 585 U. S. at ___ (III) & n.3  (138 SCt at 2217).

11

the trial court's factual findings for clear error and its legal conclusions de novo. In addition, in reviewing such a ruling, an appellate court must construe the evidentiary record in the light most favorable to the trial court's factual findings and judgment. An appellate court also generally must limit its consideration of the disputed facts to those expressly found by the trial court.

(Citations and punctuation omitted.) *Kennebrew v. State*, 304 Ga. 406, 409 (819 SE2d 37) (2018). So viewed, the testimony at the hearing on Gialenios' motion to suppress showed that the lieutenant in charge of the criminal investigations division of the Holly Springs Police Department received a call to the crime scene at approximately 11:00 p.m. on January 21, 2017. He was concerned because the police initially were presented with an execution-style shooting with no suspect, no witnesses, and no weapon on the scene. In addition, the contact nature of the fatal wound indicated that evidence might be found on the suspect if he were located quickly. Early on the following morning, Kerri informed police officers that she believed Gialenios was responsible, that he carried multiple firearms, that Gialenios knew where her sister and her father lived, and that she was concerned that she and her family were in danger.

12

And while Kerri identified Gialenios by name and believed he lived in Hall County, she did not know his address and had only his cell phone number. The lieutenant testified that he had no other reliable means to locate Gialenios other than his phone number.

Later on the same day, the lieutenant contacted Verizon Wireless to request Gialenios' cell phone records. A Verizon employee instructed the lieutenant to fill out an "Emergency Situation Disclosure" form, which stated that the request was made "pursuant to 18 U.S.C. § 2702 (b) (8) or § 2702 (c) (4) or an equivalent state law."[4] The lieutenant completed the form, affirming that the request "potentially involve[d] the danger of death or serious physical injury to a person, necessitating the immediate release of information relating to that emergency," and noting that the subject was a "murder suspect considered armed and dangerous." This

---

[4] These provisions of Title II of the Electronic Communications Privacy Act of 1986 or Stored Communications Act allow the voluntary disclosure to a governmental entity of the "contents of communications" or customer records, respectively, upon a showing that "the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of communications [or records] relating to the emergency." See *Lofton*, 310 Ga. at 778 (2) n.11.

request was sent in the early afternoon of the day following the murder, seeking information beginning with the last time Kerri had telephone contact with Gialenios, approximately two hours before the murder, to the time of the request.

At the hearing on Gialenios' motion to suppress, the lieutenant testified that when Verizon sent him the requested records, he was unable to decipher the contents. Because of the emergency situation, he telephoned Verizon again and asked the employee simply to tell him the last known location of Gialenios' cell phone. When the employee told him that the phone was last located in Gainesville, the lieutenant concluded that Gialenios was no longer an immediate risk to Kerri or her family: "And at the point [that] we determined he was in Hall County, that fear ended at that point." Nothing more was done with the records provided to the lieutenant pursuant to the emergency request, but a police officer kept Kerri's sister's house under guard until Gialenios was arrested.

Gialenios contended that because the police lieutenant improperly obtained cell phone records in violation of *Carpenter*, the

14

trial court should suppress all subsequently obtained cell phone information, including the more substantial quantity of records obtained under a later search warrant. The trial court denied the motion to suppress under the independent source exception to the exclusionary rule, see *Reaves v. State*, 284 Ga. 181, 183-184 (2) (c) (664 SE2d 211) (2008), finding that a later investigation by a GBI agent would have discovered the same cell phone-related information without relying upon the information released to the lieutenant, and that the agent's investigation independently supplied "more than enough" probable cause to support the later issuance of a search warrant for the much broader range of records sought by the GBI.[5] In its order denying Gialenios' motion for new trial, the trial court also found that exigent circumstances as permitted by *Carpenter* justified the initial release of the CSLI

---

[5] The GBI agent who obtained the search warrant testified that, while she was aware of the lieutenant's earlier request for approximately 18 hours of phone records, she did not rely upon those records but upon her independent investigation, including interviews with Gialenios and others, to support her request for a search warrant.

information for the 18 hours immediately surrounding the murder.[6]

We need not address those findings directly, because, in accordance with our decision in *Lofton*, we conclude that the exclusionary rule does not apply in the circumstances presented here.

At the time of the lieutenant's request for Gialenios' cell phone records in January 2017, no precedent controlling in Georgia courts held that a government agency's emergency request for cell site location data in the custody of a third-party cell phone service provider constituted a search under the Fourth Amendment. See *Lofton*, 310 Ga. at 776 (2); see also *Reed v. State*, 307 Ga. 527, 535 (2) (b) (837 SE2d 272) (2019) (ineffective assistance of counsel claim rejected because "[a]t the time of Appellant's trial, Georgia appellate precedent held that a search warrant was not required to obtain CSLI").

_____

[6] *Carpenter* noted that its holding was fact-specific and that a warrantless search would likely remain permissible under exigent circumstances such as "the need to pursue a fleeing suspect, protect individuals who are threatened with imminent harm, or prevent the imminent destruction of evidence," and that the holding did not "call into doubt warrantless access to CSLI in such circumstances" or "limit [the police's] ability to respond to an ongoing emergency." (Citations and punctuation omitted.) *Carpenter*, 585 U. S. at ___ (IV) (138 SCt at 2222-2223).

In *Lofton* and *Registe v. State*, 292 Ga. 154, 155-156 (734 SE2d 19) (2012), we concluded, after a thorough review of the controlling decisional and statutory law, that the applicable laws in effect at the time, particularly the provision of 18 USC § 2702 (c) (4) for voluntary disclosure of CSLI when "the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay," supported the disclosure of the CSLI without a warrant. *Lofton,* 310 Ga. at 778 (2) n.11. Bearing in mind the stated intention of the exclusionary rule to deter improper conduct on the part of police officers, see *Davis v. United States*, 564 U. S. 229, 236-237 (II) (131 SCt 2419, 180 LE2d 285) (2011), this Court held in *Lofton* that there would be no deterrent value in excluding evidence obtained by the police acting with an objectively "reasonable good faith belief" that their conduct was lawful based on a reasonable reliance on an applicable federal statute and binding appellate precedent. We concluded that, given the good-faith belief of the officer in that case that his conduct in this emergency context was lawful, "reversing the trial court's

17

decision in this case would have little, if any, additional benefit in deterring future violations of the privacy interests recognized in *Carpenter*." (Citations omitted.) *Lofton,* 310 Ga. at 784 (2).

Similarly, here the police lieutenant made a good faith request based on the applicable law at the time permitting the cell phone provider in good faith to make an emergency release of records without a search warrant. The request was made while the suspect was still at large, was likely armed, and had threatened a witness, and the police had no other immediate means to ascertain his whereabouts. As in *Lofton*, exclusion of the CSLI evidence in this case would have little, if any, effect in deterring future violations, and we therefore affirm the trial court's denial of Gialenios' motion to suppress. See *Lofton*, 310 Ga. at 784 (2).

3. Gialenios contends that the admission into evidence of his cell phone records through the business records exception to the hearsay rule violated the Sixth Amendment's Confrontation Clause. See *Johnson v. State*, 289 Ga. 22, 26 (4) (709 SE2d 217) (2011) ("The Confrontation Clause generally prohibits the admission of an out-of-

18

court testimonial statement made by a declarant who is not available for cross-examination by the accused."). Because the records were non-testimonial, we disagree.

Here, the records at issue were maintained in the ordinary course of Verizon's business, and they were not documents created for the primary purpose of establishing evidence for use in a future prosecution. See *Franklin v. State*, 298 Ga. 636, 640 (2) (784 SE2d 359) (2016). Because Verizon's business records were non-testimonial, their introduction in accordance with OCGA §§ 24-8-803 (5) and 24-9-902 (11) does not implicate the Confrontation Clause.[7]

Gialenios asserts that the United States Supreme Court's

---

[7] At trial, the State introduced Verizon's records under certification by their custodian as "true and accurate copies of the records created from the information maintained by Verizon in the actual course of business [and in its] ordinary practice" and "made contemporaneously with the transaction[s] and events stated therein." OCGA § 24-9-902 (11) provides for self-authentication of business records admissible under OCGA § 24-8-803 (6) by means of an affidavit of the records custodian. The latter Code section provides an exception to the hearsay rule for records made "at or near" the time of the described acts of "a regularly conducted business activity" made as a "regular practice of that business activity" by "a person with personal knowledge and a business duty to report." See *Hayes v. State*, 298 Ga. 98, 100-104 (2) (b) (779 SE2d 609) (2015).

decision in *Melendez-Diaz v. Massachusetts*, 557 U. S. 305 (129 SCt 2527, 174 LE2d 314) (2009), requires that an authenticating records custodian testify and be subject to cross-examination, but that is incorrect. In *Melendez-Diaz*, a drug prosecution, the documents at issue were "certificates," prepared by state forensic analysts, declaring that "the substance found in the possession of Melendez-Diaz and his codefendants was, as the prosecution claimed, cocaine — the precise testimony the analysts would be expected to provide if called at trial." 557 U. S. at 310 (II). The *sole purpose* of these documents was testimonial, and any opinions set out in the documents therefore needed to be presented by witnesses subject to cross-examination in order to comply with the Confrontation Clause. See id. "A statement is testimonial if it is made with the involvement of government officers in the production of testimonial evidence." (Citations and punctuation omitted.) *Agee v. State*, 310 Ga. 64, 70 (2) (849 SE2d 482) (2020). In contrast with a state employee preparing a document for the sole purpose of prosecution, "[w]ireless carriers collect and store CSLI for their own business purposes."

20

*Carpenter*, 585 U. S. at ___ (I) (A) (138 SCt at 2212).

Gialenios' reliance on this Court's decision in *Wise v. State*, 300 Ga. 593 (797 SE2d 447) (2017), similarly fails because the State's expert witness who interpreted the Verizon records at trial was available to testify and was cross-examined by Gialenios. The Confrontation Clause was not violated, and this enumeration of error has no merit. See *Wise*, 300 Ga. at 597-598 (4).

4. Gialenios asserts that the trial court abused its discretion in limiting the cross-examination of Kerri and her oldest son, Brendan, about whether Overseth had emotionally abused Kerri and tricked or forced her into intercourse, resulting in her pregnancy. Gialenios suggests that this evidence would have rebutted testimony that Gialenios referred to the unborn child in question as "the spawn of Hell." Under the evidence presented here, particularly given the trial court's decision to allow Gialenios to make an inquiry, though limited, on the circumstances of the pregnancy, the trial court did not abuse its discretion.

The State called Brendan, Kerri's oldest child by a previous

marriage, who testified that his mother married Overseth when he was three years old and that he treated Overseth as his father. Brendan testified that he moved out of the house when he was 18 as a result of conflicts with Overseth, and that his parents' marriage was "rough at times." Asked by the prosecutor if he had told police investigators that "there were times in the past when [he] had wished that [Overseth] were dead," he acknowledged that he had said that to members of his family but did not recall if he had said that to the police. His memory was refreshed with his transcribed statement to the police, and he acknowledged that he had made that statement.

On cross-examination, Brendan was asked if his mother ever confided in him, and he testified that Kerri told him that Overseth was "verbally abusive." He agreed that he had stated in the past that he would like to beat Overseth or kill him. Asked if Kerri confided any details of her sex life to him, Brendan responded, "Not like in to[o] great detail." He then was asked if Kerri told him "that she believed that [Overseth] raped her?" The State immediately

22

objected, and a conference was held outside the presence of the jury.

The defense contended that Brendan's testimony regarding his mother's marriage had opened the door to asking Brendan about whether his mother ever told him that the unborn child was a "rape baby" and argued that the "rule of completeness" in OCGA § 24-8-822 demanded that Brendan's entire police interview come into evidence. The trial court ruled that any such statement was hearsay not subject to an exception, that it was not relevant to any issue in the case, and, finally, that "the prejudicial effect . . . far outweighs any probative value of this," and instructed the jury to disregard the question.

Before the defense cross-examination of Kerri, this evidence was discussed once again. Gialenios contended that, because Kerri testified that he called the baby "the spawn of hell," he was entitled to elicit testimony that the child was the product of rape. The trial court reiterated that any question on cross-examination could not inquire whether Kerri had mentioned "rape" or a "rape baby," but

that counsel could ask Kerri how the child was conceived.[8]

The trial court did not abuse its discretion in limiting Gialenios' questioning with regard to this issue.

> Although a defendant's right to cross-examine witnesses is secured by the Sixth Amendment to the Constitution, that right does not allow for unlimited questioning. Trial courts retain wide latitude to impose reasonable limits on cross-examination based on concerns about, among other things, interrogation that is only marginally relevant.

(Citations and punctuation omitted.) *Harris v. State*, 302 Ga. 832, 836 (3) (809 SE2d 723) (2018).

(a) Since the enactment of Georgia's current Evidence Code, "[a]dmissibility of evidence of a victim's character is now governed by OCGA §§ 24-4-404 (a) (2) and 24-4-405 (a), which generally limit evidence of a victim's character to reputation or opinion and not specific bad acts." *White v. State*, 307 Ga. 882, 885 (2) (838 SE2d 828) (2020). Moreover, even relevant evidence may be excluded if the trial

---

[8] In response to a question on cross-examination, "And what did you tell [Gialenios] about how it was that you became pregnant with this baby?" Kerri responded that she told him that Overseth "made [her] some strong vodka tonics" in order to encourage her to have sex with him, and that his contraception failed.

24

court finds that "its probative value is substantially outweighed by the danger of unfair prejudice." OCGA § 24-4-403 ("Rule 403"). Even assuming without deciding that the testimony Gialenios sought to elicit from Brendan was in any way relevant and was not excludable as hearsay, we agree with the trial court that the evidence was not probative and was overly prejudicial to Overseth by suggesting that he was deserving of death, whether at the hands of Gialenios or someone else.

> [T]here remains a presumption in this State that character evidence is inadmissible, and this presumption is particularly strong as to the character of the victim in a criminal case. This presumption will continue in the new [E]vidence [C]ode. See OCGA § 24-4-404 (effective Jan. 1, 2013). Courts of law are, and should be, on guard against "frontier" justice — judgment based not on the evidence and the law but rather on the jury's view of whether the victim "needed killing." Thus, we have emphasized that "it is just as unlawful to murder a violent person as it is to murder a nonviolent person."

(Citations omitted.) *State v. Hodges*, 291 Ga. 413, 425 (4) (728 SE2d 582) (2012) (Nahmias, J., concurring specially). Particularly after permitting Brendan to testify about Overseth's verbal abuse of Kerri and in light of its ruling permitting Gialenios to examine Kerri

regarding the circumstances of her pregnancy, the trial court did not abuse its discretion in prohibiting reference to the terms "rape" or "rape baby."

(b) In another enumeration of error, Gialenios relies upon the "rule of completeness" in OCGA § 24-8-822.[9] Gialenios asserts that, once Brendan referred to his statement to the police to refresh his recollection, Gialenios should have been allowed to cross-examine Brendan with regard to his entire statement, including his alleged mention of Kerri's "rape baby" remark, and that Gialenios also should have been able to cross-examine Kerri with regard to whether she made such a statement. The trial court noted Gialenios' assertion of the rule of completeness but concluded that the remark's prejudicial effect outweighed its probative value, if any. Assuming without deciding that the matter sought to be introduced by

---

[9] OCGA § 24-8-822 provides: "When an admission is given in evidence by one party, it shall be the right of the other party to have the whole admission and all the conversation connected therewith admitted into evidence." This Code provision is identical to former OCGA § 24-3-38, and cases decided under the former Code section therefore remain good law. See *Jackson v. State,* 301 Ga. 866, 869 (3) n.3 (804 SE2d 367) (2017).

26

Gialenios falls within the scope of OCGA § 24-8-822,[10] see generally *State v. Holmes*, 304 Ga. 524, 530 (2) (b) n.6 (820 SE2d 26) (2018), we cannot say that the trial court abused its discretion.

The rule of completeness "prevents parties from misleading the jury by presenting portions of statements out of context, but it does not make admissible parts of a statement that are irrelevant to the parts of the statement introduced into evidence by the opposing party." (Citations and punctuation omitted.) *Jackson v. State*, 301 Ga. 866, 869 (3) (804 SE2d 367) (2017). It "permits introduction only of additional material that is relevant and is necessary to qualify, explain, or place into context the portion already introduced." (Citation and punctuation omitted.) Id. Here, Brendan's statement

---

[10] We note that the Evidence Code contains another rule-of-completeness provision. OCGA § 24-1-106 says:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which, in fairness, should be considered contemporaneously with the writing or recorded statement.

Unlike OCGA § 24-8-822, this provision "mirrors Federal Rule of Evidence 106" and is interpreted consistently with federal appellate decisions construing the federal rule. *Edwards v. State*, 308 Ga. 176, 182 (2) n.3 (839 SE2d 599) (2020). But Gialenios does not argue his claim under OCGA § 24-1-106.

to the police was not introduced into evidence or published to the jury; indeed, it does not even appear in the trial record. Brendan simply refreshed his recollection from the statement with regard to what he had told the police and then testified based on his recollection of the events in question. Similarly, while Kerri testified to telling Gialenios about her pregnancy, no evidence was introduced of any statement by her with regard to a "rape baby," and Kerri did not testify about making such a statement. The wording and context of this alleged remark are not part of the trial record, and thus we cannot say that the trial court abused its discretion in ruling that the remark was not "necessary to qualify, explain, or place into context" any statement. This enumeration of error therefore is without merit.

5. Gialenios contends that the trial court improperly admitted as "intrinsic evidence" testimony and photographs regarding his entry into Kerri's sister's back yard in the middle of the night to leave flowers, valentine cards, and a note for Kerri. He argues that the evidence was not relevant because the loitering-and-prowling

28

and stalking charges against him were severed for trial, that the evidence was not intrinsic, that it was barred by Rule 403, and that it was unfairly prejudicial and should have been excluded.[11] We disagree.

The requirements of OCGA § 24-4-404 (b) do not apply to "intrinsic evidence," which is an uncharged act arising from the same transaction or series of transactions as the charged offense, necessary to complete the story of the crime, or "inextricably intertwined" with the evidence of the charged offense. *Williams v. State*, 302 Ga. 474, 485 (IV) (d) (807 SE2d 350) (2017).

> [E]vidence of other acts is inextricably intertwined with the evidence regarding the charged offense if it forms an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted. And this sort of intrinsic evidence remains admissible even if it incidentally places the defendant's character at issue.

(Citations and punctuation omitted.) Id. at 486 (IV) (d). Whether to

---

[11] In granting the motion to sever, the trial court expressly noted that it was not ruling on the admissibility at Gialenios' trial on the murder charges of the evidence underlying the severed charges, and that the evidence would not necessarily be inadmissible.

admit such evidence is a matter within the trial court's sound discretion. See *Fleming v. State*, 306 Ga. 240, 245 (3) (a) (830 SE2d 129) (2019). And while intrinsic evidence must also satisfy the requirements of Rule 403,[12]

> it is only when *unfair* prejudice substantially outweighs probative value that the rule permits exclusion. And Rule 403 is an extraordinary remedy, which should be used only sparingly, and the balance should be struck in favor of admissibility. Thus, in reviewing issues under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact.

(Citations and punctuation omitted; emphasis in original.) *Anglin v. State*, 302 Ga. 333, 337 (3) (806 SE2d 573) (2017).

Here, the evidence at issue was necessary to complete the story of the crime, because it sheds light on Gialenios' motives in his single-minded and continuing pursuit of Kerri without any apparent concern over her husband's murder or his previous threats. And the probative value of the evidence was not substantially outweighed by

---

[12] OCGA § 24-4-403 provides: "Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

the danger of unfair prejudice under Rule 403, particularly in light of the trial court's caution that the witnesses were not to testify to Gialenios' arrest for the severed charges or to mention those charges by name. We cannot say that the trial court abused its discretion in admitting this evidence.

6. Finally, Gialenios asserts that the trial court erred in denying his motion to suppress his interview with the police, which took place in the front yard of his residence in Hall County. He contends that he was in custody and was not given his *Miranda* warnings[13] and that he invoked his right to remain silent and asked for an attorney.

> *Miranda* warnings are required only when a person is interviewed by law enforcement while in custody. One is considered to be "in custody" for *Miranda* purposes if he has been formally arrested or his freedom of movement has been restrained to the degree associated with a formal arrest. The determination of custody in this context requires assessing whether a reasonable person in the suspect's situation would perceive that he was at liberty to terminate the interview and leave.

---

[13] See *Miranda v. Arizona,* 384 U. S. 436, 467-468 (III) (86 SCt 1602, 16 LE2d 694) (1966).

(Citations and punctuation omitted.) *Drake v. State*, 296 Ga. 286, 288-289 (2) (766 SE2d 447) (2014). The circumstances surrounding the admissibility of a defendant's statement are determined by the trial court and construed by an appellate court in the light most favorable to the trial court's findings, which will be upheld unless they are clearly erroneous. See *State v. Rumph*, 307 Ga. 477, 477-478 (837 SE2d 358) (2019).

So viewed, the evidence presented at the hearing on the motion to suppress — consisting of the testimony of four law enforcement officers, four photographs, and portions of an audio recording of the interview with Gialenios at his home[14] — supports the trial court's finding that Gialenios was not in custody. In the early afternoon of January 23, 2017, the Monday after the Saturday night murder, a Holly Springs police detective and a GBI agent drove to the area of Gialenios' home. Because they had been unable to determine Gialenios' actual address, a Holly Springs police sergeant and a

---

[14] The prosecution and defense stipulated to the playing of the first 11 minutes and last 26 minutes of the recorded interview for the trial court.

32

Cherokee County sheriff's deputy accompanied them in another car and a Hall County K9 officer who was familiar with the area also assisted them in looking for Gialenios' residence.

The police sergeant eventually spotted Gialenios' vehicle parked beside a single-wide mobile home and called the other officers. They initially approached the mobile home, but it was unoccupied; Gialenios was living in a shed or outbuilding behind it. When the Hall County officer walked around the side of the mobile home, he encountered Gialenios, who had a .45-caliber pistol and a large hunting knife in his waistband and was accompanied by a very large, mastiff-type dog. The Hall County officer drew his sidearm at "low ready" — that is, pointed toward the ground — and instructed Gialenios to control his dog and not to reach for a weapon. The other officers gathered; they initially had their weapons drawn but reholstered them when Gialenios put his hands in the air.[15] The Holly Springs detective approached Gialenios to secure his weapons,

---

[15] Asked on cross-examination if Gialenios observed the other officers with their pistols drawn, the detective responded that they approached him from the side and rear, "so he didn't even see them until they got there."

and Gialenios dropped to his knees; the detective asked him to stand up and told him he did not need to get down, and informed him that he was not under arrest. The detective secured the pistol and knife, and asked Gialenios if he would come to the Gainesville Police Department to talk with them. Gialenios said that he would speak to them at the department later, but he "had some things to do."

At this point, the GBI agent perceived that "tensions were a little high," probably as a result of the police having had to disarm Gialenios, and that Gialenios and the detective did not seem to have "a very good rapport with one another," so she persuaded the other officers to step away so that she could talk to Gialenios by herself. She introduced herself, and apologized for starting "on the wrong foot" with five officers on the scene. The agent testified that "then [Gialenios] seemed more agreeable to speak with me."

She asked if Gialenios would talk to them at the police department, but he declined, saying he had errands to run and might come to the police department the next day. The agent asked if he would talk to her there, instead, adding that she had her

notebook in the car. He responded, "Yes, as best I can." They spoke for between an hour and an hour and a half, and near the end of that time Gialenios called his father on his cell phone. After that call, in which Gialenios' side of the conversation but not his father's was audible on the recording, he told the agent that he did not want to talk further and asked for an attorney. The agent immediately ended the interview, and Gialenios called his mother, who came and picked him up to get something to eat. The agent testified that Gialenios was never given *Miranda* warnings because he was never in custody, he was never put in handcuffs or otherwise restrained, and he was not coerced, threatened, or promised any benefit.

The trial court denied Gialenios' motion, finding that, while the encounter began "at a pretty heightened level of stress," it calmed down and then the GBI agent conducted her interview; that Gialenios declined to go to the station and there was no restriction on his leaving; and that Gialenios "seemed pretty agreeable to talk to [the GBI agent]." The trial court concluded that Gialenios' decision to speak with the agent was voluntary. In its order denying

35

Gialenios' motion for new trial, the trial court further found that under the totality of the circumstances, Gialenios was not in custody when he gave his statement, that nothing indicated that the statement was the product of the slightest hope of benefit or remotest threat of injury,[16] and that in any event admission of the statement was harmless because it contained nothing incriminating.

Here, the evidence supports the trial court's conclusions. Evidence was presented that Gialenios was not in custody: he was told that he was not under arrest, and he was requested, not ordered, to go to the police station and he declined to do so. He did not wish to speak to the Holly Springs detective, but agreed to talk to the GBI agent in front of his home. Photographs of the interview and the audio recording confirm that he was not handcuffed or

---

[16] While Gialenios can be heard during the phone conversation with his father and again in speaking with the GBI agent claiming that the detective had threatened him and said that they would "make [him] talk," the detective denied having said this, and the trial court apparently credited that testimony. The trial court's factual findings and credibility determinations will be upheld unless clearly erroneous. See *Rumph*, 307 Ga. at 477-478.

36

restrained, and his conversation with the GBI agent was relaxed and polite. He did not indicate a desire not to speak or that he wanted an attorney until the end of the interview, and when he communicated this the agent immediately turned off the recorder and stopped the interview. The trial court correctly concluded that Gialenios was neither formally arrested nor restrained to the degree associated with a formal arrest, and *Miranda* warnings therefore were not required. See *Rumph*, 307 Ga. at 481-482 (reversing trial court's conclusion that defendant was in custody when, among other things, defendant agreed to speak with officers and retained his keys and phone and made phone calls during questioning); *Drake*, 296 Ga. at ___ (2) (defendant not in custody when investigators asked rather than demanded to speak with him, he voluntarily agreed to go to police station, he was never physically restrained or threatened, and he was told that he was not under arrest). The trial court's determination that Gialenios' statement to police was non-custodial and voluntary was not clearly erroneous.

*Judgment affirmed. All the Justices concur, except Melton, C.*

37

*J., not participating.*


DECIDED MARCH 1, 2021.
Murder. Cherokee Superior Court. Before Judge Baker.
*James K. Luttrell*, for appellant.
*Shannon G. Wallace, District Attorney, Cliff Head, Zachary H. Smith, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Kathleen L. McCanless, Assistant Attorney General*, for appellee.