312 Ga. 202
FINAL COPY

S21A0623.  MOSS v. THE STATE.

BETHEL, Justice.

Lenny Ozzylee Moss was found guilty of the malice murder of Tyisha Davis and other offenses at a bench trial before the McDuffie County Superior Court. Following the denial of his motion for new trial, Moss appeals, arguing that we should reverse his murder conviction because his trial counsel had a conflict of interest which prevented her from vigorously cross-examining a State witness she had previously represented in an unrelated criminal matter. We affirm.[1]

---

[1] The crimes occurred on December 20, 2016. On June 13, 2017, a McDuffie County grand jury returned a nine-count indictment against Moss, charging him with the malice murder of Davis (Count 1); the felony murder of Davis (Count 2); the aggravated assaults of Davis, C. I. (a minor), T. M. (a minor), Jacorbin Ivey, and O. W. (a minor) (Counts 3 to 7); cruelty to children in the first degree against L. M., A. M., J. M., and M. M. (minors) (Count 8); and three counts of possession of a firearm during the commission of a felony (Counts 9 to 11). Following a hearing on March 14, 2018, Moss waived his right to a jury trial. At a bench trial held from May 15 to 17, 2018, the trial court found Moss guilty of all counts. On May 18, 2018, the trial court sentenced

1. The evidence presented at trial showed the following. Moss and Davis were married and had four children together — L. M., A. M., J. M., and M. M. — who ranged in age from one year old to six years old at the time of the crimes. The relationship between Moss and Davis was marred by several incidents involving physical violence. As a result, Moss and Davis separated in the fall of 2016, and Davis lived for a time at her grandmother's house with the children.

In December 2016, Davis moved with her children back to the house she previously shared with Moss and changed the locks. In the days just before Davis and the children moved back to the house, Moss was staying overnight elsewhere but had been coming to the

Moss to life in prison without the possibility of parole on Count 1, terms of 20 years in prison each on Counts 4 to 8, to be served consecutively to Count 1 but concurrently with each other, and terms of five years in prison each on Counts 9 to 11, to be served consecutively to Count 8 and to each other. Counts 2 and 3 were vacated by operation of law or merged for sentencing. On June 14, 2018, Moss filed a motion for new trial, which he amended through new counsel on February 12, 2020. Following a series of hearings, the trial court denied the motion, as amended, on November 4, 2020. Moss filed a notice of appeal on December 2, 2020. His case was docketed to this Court's April 2021 term and orally argued on April 22, 2021.

house periodically to pick up clothing and shower. Jacorbin Ivey and C. I., Davis's brother and sister, came to stay with Davis.[2] Davis told Ivey that Moss had threatened to kill her, and Ivey testified that he was staying with Davis "for her protection."

On the evening of December 20, 2016, Davis, Ivey, C. I., and Davis's children were at the house. Davis's cousin, O. W., and Ivey's friend, T. M., were also visiting the house that evening.[3] T. M. was in the kitchen with Davis and C. I. as they were preparing dinner.

At some point that evening, Moss sent Davis a text message that said, "If I can't have you, nobody else can." Davis replied that she did not want to be with him and that he should stop texting her; she then blocked his number.[4] A few minutes later, Moss knocked on the front door, and one of his children let him in. Moss came in

---

[2] C. I. was 14 years old when she testified at Moss's trial, which occurred roughly a year and a half after Davis was killed.

[3] T. M. and O. W. were 18 and 15 years old, respectively, at the time of Moss's trial.

[4] O. W. saw this text exchange on Davis's phone and testified about it. Efforts by investigators to retrieve the contents of Davis's phone were unsuccessful because the phone's ports had been damaged. Moss's cell phone was recovered when he was arrested, but no messages dated before December 21, 2016, were found on the phone.

the house, pointed his gun at T. M., and said, "Why you in my house?" T. M. ran into the back bedroom and hid in a closet with Ivey. Moss walked down the hallway with his gun and pointed it at O. W.

Moss then went into the kitchen to confront Davis. C. I. began to run out of the house, and Davis told Moss to put the gun down. Moss then shot Davis in the chest, knocking her to the ground. C. I. ran out the front door and to a neighbor's house where she called 911. The children, who were in the living room, tried to run out of the house to C. I., but Moss "grabbed them" and "put [them] back in the house."

After hearing gunshots, O. W. also called 911. Moss then went outside, walked around the house to the back bedroom window, and fired several shots through the window and into the room where Ivey and T. M. were still hiding. Moss then fled.

Several police officers arrived in response to the 911 calls. One officer went inside the house, where he found the children in the living room sitting on the couch and crying. One of the children said,

4

"He shot my mama, he shot my mama." The officer removed the children from the house and took them to the neighbor's house across the street.

The officer then found Davis's body in the kitchen. She was wearing only a t-shirt and socks. By the time the officer reached her, she had no pulse, and efforts to revive her were unsuccessful. The medical examiner testified that Davis suffered gunshot wounds to her chest and right groin. The shot fired at Davis's chest appeared to have been fired from less than a foot away and was fatal. The gunshot wound to her groin appeared to have been inflicted as she lay on the kitchen floor.

Moss testified in his own defense at trial as follows. Davis had once told him that another man was the father of M. M. Moss had never met T. M. prior to the night of the shooting, but he claimed that, before the shooting, he saw a video on Facebook in which T. M. was in the house with Moss's children and referred to them as his "stepkids." Moss also claimed that he saw text messages sent between Davis and T. M. (and between Davis and several other

men).[5]

As to Davis's shooting, Moss learned on December 20 that Davis and the children had moved back into the house. Earlier in the day, Davis asked him to buy several items from the store and bring them to the house. Moss came to the house that night and saw Davis through the kitchen window as Moss was pushing a trash can to the street. He also saw T. M., whom he did not recognize at the time, sitting at the kitchen table. Davis was wearing only a t-shirt and socks. T. M. then approached Davis and began kissing her, grabbing her breasts, and reaching under her shirt. Moss "got a raise of energy," finished pushing the trash can to the street, came around the house, and knocked on the front door. After one of the children let him in, Moss saw T. M. and was "spooked." He approached T. M. and said, "Who are you? What are you doing in my house?" Moss then "blacked out," "lost it," and began firing his gun.

Moss testified that he had no intention of harming anyone

---

[5] Moss admitted on cross-examination that he had no physical evidence that these messages existed.

when he went to the house that night. He felt "rage" when he saw T. M. touching Davis, and he recalled chasing T. M. down the hallway to the bedroom and firing into the bedroom. He did not realize that Davis had been shot until he came back up the hallway. He then grabbed several items from the house and ran away. He later admitted firing four shots into the bedroom from outside after he left the house. He stated that this was the first time he had ever caught another man "in the house with [Davis] while she's ninety percent naked."

Moss also called his sister, Lukenya Moss-Jones, to testify. She testified that she saw text messages sent between Davis and T. M. in October 2016 that suggested to her that the two of them had a relationship. Moss-Jones testified that she told Moss about the text messages. She testified that Moss had been suspicious "for years" that Davis had been unfaithful to him throughout their relationship and that another man was the father of one of the children.

Regarding Moss's assertion that he and Davis were in a relationship, T. M. testified that he knew Davis only through Ivey

7

and that he and Davis did not have a relationship and had not met before the day of the shooting.[6] Ivey testified that Davis and T. M. "didn't have nothing going on, nothing, nothing whatsoever." Finally, C. I. testified that Davis and T. M. were friends, that she did not see him touch Davis, and that there was no "intimate contact" between them.

2. In his sole enumeration of error, Moss argues that his right to the effective assistance of counsel under the United States Constitution and the Georgia Constitution was violated. See U. S. Const. Amend. VI; Ga. Const. of 1983, Art. I, Sec. I, Par. XIV. Moss argues, as he did before the trial court, that his trial counsel's previous representation of T. M. in an unrelated criminal matter

---

[6] Moss and T. M. are cousins, but T. M. testified that they did not know each other well. During his direct examination, T. M. admitted that he had since been convicted of voluntary manslaughter and was serving a term of 20 years in prison. He was otherwise largely uncooperative with the prosecutor and stated repeatedly that he could not remember that evening's events, including whether he had given a statement to the police. The trial court eventually permitted the prosecutor to treat T. M. as a hostile witness. During cross-examination, T. M. stated several times that he did not remember certain events from the evening. Through the testimony of a police officer, the trial court admitted statements that T. M. gave to the police on the night of the shooting about the incident. In those statements, T. M. admitted being in the kitchen that night before the shooting.

created an actual conflict of interest that hindered counsel from vigorously cross-examining T. M. at trial. Moss argues that a more thorough cross-examination of T. M., specifically with respect to whether T. M. had any physical or romantic relationship with Davis or made any intimate contact with her on the night of the shooting, was critical to Moss's defense strategy of being found guilty of voluntary manslaughter rather than malice murder. We disagree that Moss has shown an actual conflict of interest on the part of his trial counsel.

(a) The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." Similarly, the Georgia Constitution of 1983 provides that "[e]very person charged with an offense against the laws of this state shall have the privilege and benefit of counsel[.]" Ga. Const. of 1983, Art. I, Sec. I, Par. XIV. "It is well established that the right to counsel protected by the Sixth Amendment and the Georgia Constitution is the right to the effective assistance of counsel." (Citations and

punctuation omitted.) *Edwards v. Lewis*, 283 Ga. 345, 348 (2) (658 SE2d 116) (2008).

"One component of the right to the effective assistance of counsel is the right to representation that is free of actual conflicts of interest." *Edwards*, 283 Ga. at 348 (2); see also *Cuyler v. Sullivan*, 446 U. S. 335, 350 (IV) (C) (100 SCt 1708, 64 LE2d 333) (1980). An actual conflict, for purposes of the right to counsel, "is a conflict of interest that adversely affects counsel's performance, not just a mere theoretical division of loyalties." (Citation and punctuation omitted.) *Williams v. State*, 302 Ga. 404, 408 (3) (807 SE2d 418) (2017). If the defendant shows that his trial counsel had an actual conflict of interest, he need not show that the outcome of the proceedings would have been different to receive a new trial. See *Holloway v. Arkansas*, 435 U. S. 475, 487-491 (III) (98 SCt 1173, 55 LE2d 426) (1978). Instead, prejudice is presumed if the defendant "demonstrate[s] that the conflict of interest existed and that it significantly affected counsel's performance." (Citation and

punctuation omitted.) *Edwards*, 283 Ga. at 349 (2).[7]

> In cases where an alleged conflict of interest is based upon defense counsel's prior representation of a prosecution witness, [courts] must examine the particular circumstances of the representations to determine whether counsel's undivided loyalties remain with his or her current client, as they must. In this regard, . . . the factors that arguably may interfere with effective cross-examination include: (1) concern that the lawyer's pecuniary interest in possible future business may cause him or her to avoid vigorous cross-examination which might be embarrassing or offensive to the witness; and (2) the possibility that privileged information obtained from the witness in the earlier representation might be relevant to cross-examination. Another factor that should be considered in determining whether an actual or potential conflict of interest rendered trial counsel ineffective, is whether the subject matter of the first representation is substantially related to that of the second.

(Citations and punctuation omitted.) *Moon v. State*, 288 Ga. 508, 514-515 (8) (705 SE2d 649) (2011). In reviewing the decision of the

---

[7] The question of whether counsel's representation of the defendant was affected is different from the question of whether the outcome of the trial was affected, which is at issue in most ineffective assistance of counsel cases. See *Strickland v. Washington*, 466 U. S. 668, 684 (I) (D) (104 SCt 2052, 80 LE2d 674) (1984); see also *Edwards*, 283 Ga. at 351 (2) ("[T]he critical question is whether the conflict significantly affected the *representation*, not whether it affected the outcome of the underlying *proceedings*." (emphasis in original)). Moss has not raised a claim of ineffective assistance of counsel under *Strickland* in this appeal.

11

trial court on a conflict-of-interest claim,

> we owe no deference to its application of the law to the facts of this case. We owe substantial deference, however, to the way in which the trial court assessed the credibility of witnesses and found the relevant facts. To that end, we must accept the factual findings of the trial court unless they are clearly erroneous, and we must view the evidentiary record in the light most favorable to the findings and judgment of the trial court.

(Citations omitted.) *Tolbert v. State*, 298 Ga. 147, 151 (2) (a) (780 SE2d 298) (2015).

As discussed below, we agree with the trial court's determination that Moss has failed to show that his trial counsel had an actual conflict of interest that significantly and adversely affected her representation of Moss. Thus, Moss's claim of ineffective assistance of counsel on this basis fails.

(b) At the hearing on Moss's motion for new trial, his trial counsel testified that the defense strategy was to show that Moss shot Davis "in the heat of passion" and that because he appeared to have no complete defense to murder available, the goal of the trial was to avoid a murder conviction even if that meant Moss would be

convicted of voluntary manslaughter. Trial counsel indicated that it was important to corroborate Moss's testimony about seeing T. M. with Davis just before the shooting and to establish that T. M. and Davis had a relationship leading up to the shooting. Counsel testified that her goal was to show that whatever Moss saw or heard just before the shooting was sufficient to "provoke him into a rage that caused him to act as he did."

At the hearing, trial counsel recalled that T. M. testified on direct examination that he did not have any relationship with Davis. Trial counsel also conceded on cross-examination that "it was going to be a difficult road or battle" regardless of T. M.'s trial testimony. She acknowledged that Moss's account of the crimes, including his testimony about moving a trash can to the street, chasing others in the house down a hallway, and later firing shots into the house from the yard, made the defense strategy "more difficult."

The record also shows that trial counsel had previously represented T. M. in an unrelated murder case. She began representing him on July 14, 2015. Counsel testified that, due to T.

13

M.'s lack of cooperation in preparing his defense, she did not have "any meaningful contact" with T. M. after August 21, 2015. According to counsel, T. M. was no longer communicating with her after that date, and her relationship with T. M. was "for all intents and purposes . . . pretty much over" by that time, although she did not formally withdraw from representing him until October 24, 2017. She began representing Moss on July 17, 2017.[8] Thus, the period in which she was serving as counsel for both T. M. and Moss in their separate cases overlapped by a few months.[9]

Counsel testified that, at the time she represented T. M., she was not aware that he was connected to Moss's case. Counsel testified that she only became aware that T. M. had been a witness

---

[8] Moss was initially represented by a public defender.

[9] Moss's trial counsel began practicing law in 1983 and focused primarily on criminal and domestic-relations cases, including four years of service as a public defender. She testified that she generally practiced in small rural counties and that it was common for her to try cases in which she had previously represented a State witness. Counsel testified that because of this experience she was "keen and aware" of possible conflicts in the representation and that she "kept an eye out" for such conflicts. Counsel later reiterated that this situation, in which a former client was a witness for the State, "was . . . something [she] had dealt with before."

to Davis's shooting in January 2018, when she received discovery from the State listing T. M. as a witness. This was several months after her representation of T. M. ended and roughly two-and-a-half years since her last contact with him.

T. M. was serving a 20-year prison sentence at the time,[10] and in the months leading up to Moss's trial, counsel did not try to interview T. M. She saw T. M. at the jail on one occasion when she was there to visit Moss. In a brief conversation, counsel and T. M. mostly discussed T. M.'s case and a case involving his father. Counsel asked T. M. if he knew Moss. T. M. told her that Moss was his cousin but did not tell her anything about Davis's shooting.

Counsel testified that, before trial, she met with Moss five or six times. Moss told counsel about the shooting and that he believed Davis was having an affair with the man he saw in the kitchen that night, based at least in part on a video he had previously seen on

---

[10] After trial counsel withdrew from representing T. M., new counsel was appointed for him. T. M. later went to trial on his murder charge. He was found guilty of voluntary manslaughter and sentenced to 20 years in prison, which he was serving at the time of Moss's trial.

Facebook of the man talking about Davis's children. Moss told her that in the video the man referred to Davis's children as his "stepkids." However, counsel indicated that she was never able to obtain the video to which Moss referred. At the time, neither Moss nor counsel knew that the man Moss claimed to have seen was T. M. Counsel testified that because T. M. was four or five years younger than Davis and only 15 years old when counsel began representing him, she did not think, given his young age, he "would have been having an affair with anybody, especially knowing what his circumstances were" at the time of Davis's shooting, namely, that he was out of jail on bond and awaiting trial on a murder charge.

However, counsel testified that, in light of the defense strategy she planned for Moss, once she determined that T. M. was in the house when Moss shot Davis, she wanted to find some evidence to corroborate Moss's allegation that T. M. had a relationship with Davis. Counsel was unable to do so but expressed her view that a video or similar evidence that T. M. and Davis were in a relationship "wouldn't have been Earth-shattering news one way or another."

Counsel testified that she attempted to cross-examine T. M. at trial but that he was uncooperative. Counsel denied that she was worried that a "heavy" cross-examination of T. M. would cost her further referrals in criminal cases from T. M. or his father (who had initially approached counsel to represent T. M.),[11] and she indicated that she did not have an emotional bond with T. M. that caused her to limit her questioning of him. Counsel testified that she was "stunned" by T. M.'s trial testimony, as she assumed he would be forthright and answer the questions he was asked, including in regard to his relationship with Davis and other members of her family. Counsel agreed that T. M. was "significantly discredited" during his direct examination by the prosecutor and through the testimony of a police officer who testified about previous statements T. M. had given about being present in the house during the shooting. In its order denying Moss's motion for new trial, the trial

---

[11] By the time of Moss's trial, T. M.'s father had already indicated to counsel that he would not pay for any further defense for T. M. due to his lack of cooperation with counsel. In addition, T. M.'s father had been charged with a number of federal offenses. Counsel was not representing the father in his case.

court stated that it credited the testimony of trial counsel in reaching its determination that no actual conflict of interest was present.

(c) Here, all of the factors this Court identified in *Moon* support the conclusion that counsel had no actual conflict of interest. See 288 Ga. at 514-515 (8).

(i) *Pecuniary Interest.* First, as the trial court found, there was no evidence that counsel had any pecuniary interest in receiving future legal business from T. M. or members of his family. The record shows that T. M. was serving a 20-year prison sentence at the time of Moss's trial and that T. M.'s father was facing federal criminal charges. Counsel herself indicated that she had no expectation that she would provide further representation for T. M. or his family members. In its order on Moss's motion for new trial, the trial court noted that it found trial counsel's testimony to be credible. Because we defer to the trial court's credibility judgments and because the trial court's determination in regard to this factor was otherwise supported by evidence in the record, we do not disturb

18

it. See *Hill v. State*, 269 Ga. 23, 25 (2) (494 SE2d 661) (1998) (no hope of pecuniary gain where State witness who was prior client of defense counsel was serving 20-year prison sentence at time of defendant's trial).

(ii) *Confidential Information Received in Prior Representation of T. M.* Likewise, we agree with the trial court that Moss has presented no evidence that counsel obtained privileged information from T. M. that prevented her from conducting a thorough cross-examination of him at Moss's trial. The record shows that, although counsel simultaneously represented T. M. and Moss for a few months, her relationship with T. M. had essentially concluded in August 2015 — over a year before Moss shot and killed Davis — and that counsel had no meaningful contact with T. M. in an attorney-client capacity after that time. Counsel testified that she did not become aware that T. M. was a witness and alleged victim in Moss's case until after her representation of T. M. had concluded and that she did not receive any information from T. M. about Moss's case. As noted above, the trial court found counsel's testimony about her

19

relationship with T. M. to be credible.

Moss argues that "if" T. M. told trial counsel whether he was having an affair with Davis (including a denial that such a relationship existed), counsel would have been barred by the Georgia Rules of Professional Conduct from disclosing that information to Moss. Moss further argues that if T. M. denied having a relationship with Davis, counsel would be barred from introducing evidence suggesting otherwise. Finally, Moss suggests that counsel's failure to more aggressively confront T. M. about his relationship with Davis is itself evidence that counsel was operating under a conflict of interest that limited her ability to cross-examine T. M.

However, we need not consider the extent to which compliance with the Georgia Rules of Professional Conduct might have limited counsel's ability to question T. M. Moss's assertions about what T. M. may have told counsel about his relationship with Davis or how counsel might have in turn limited the scope of her questioning of T. M. are purely speculative, and mere speculation about potential conflicts of interest cannot establish that a conflict significantly and

20

adversely affected counsel's performance at trial. See *Sullivan*, 446 U. S. at 350 (IV) (C) ("[T]he possibility of conflict is insufficient to impugn a criminal conviction."); see also *Lamb v. State*, 267 Ga. 41, 42 (1) (472 SE2d 683) (1996) ("[T]he conflict must be palpable and have a substantial basis in fact. A theoretical or speculative conflict will not impugn a conviction which is supported by competent evidence.").

Moreover, counsel's decisions regarding the scope and extent of her cross-examination of T. M. and how best to present evidence of a relationship between T. M. and Davis were objectively reasonable under the circumstances of Moss's trial. Counsel had been unable to locate video or other physical evidence of a relationship between T. M. and Davis with which she could confront T. M. Counsel did, however, call Moss's sister to testify about the alleged relationship between T. M. and Davis.

Based on counsel's assessment of the damage already done to T. M.'s credibility by his performance on the witness stand and the limited prospect that he would suddenly choose to cooperate, counsel

could reasonably determine that any further efforts to cross-examine him or impeach his testimony would be fruitless or unnecessary and that evidence of the relationship could be presented through the testimony of other witnesses. We regularly afford deference to these types of decisions in the context of a claim that counsel performed deficiently under *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984), and claims involving alleged conflicts of interest on the part of counsel, and we do so here. See *Tolbert*, 298 Ga. at 157 (2) (d) n.11 (noting that reasonable strategic defense choices are "virtually unassailable" in the context of a conflict-of-interest claim of ineffective assistance of counsel); see also *Gaston v. State*, 307 Ga. 634, 643 (2) (d) (837 SE2d 808) (2020) (reasonable to forgo cross-examination of State witnesses where defense counsel determined that witnesses were "complete failures who destroyed themselves when they got on the stand." (punctuation omitted)); *Edwards v. State*, 299 Ga. 20, 24 (2) (785 SE2d 869) (2016) ("[D]ecisions about what questions to ask on cross-examination are quintessential trial strategy and will rarely

22

constitute ineffective assistance of counsel. In particular, whether to impeach prosecution witnesses and how to do so are tactical decisions." (citation and punctuation omitted)).

(iii) *Subject Matter of Representations*. Finally, counsel represented Moss and T. M. in separate cases involving separate events. By the time of Moss's trial in 2018, counsel's "prior representation [of T. M.] was concluded[,] and [it] was wholly unrelated to the present case." *Moon*, 288 Ga. at 515 (8). Thus, the subject matter of counsel's representation of T. M. was not "substantially related" to her representation of Moss. (Citation and punctuation omitted.) Id.

For these reasons, we conclude that Moss has not shown that his trial counsel labored under "an actual conflict of interest that significantly and adversely affected the adequacy of the lawyer's representation of him at trial." *Tolbert*, 298 Ga. at 157 (2) (d). Moss's claim of ineffective assistance of counsel on that basis therefore fails.

*Judgment affirmed. All the Justices concur, except Colvin, J., not participating.*

23

Decided August 10, 2021.

Murder. McDuffie Superior Court. Before Judge Hammond.

*Lee & Ziegler, Konrad G. W. Ziegler*, for appellant.

*William P. Doupe´, District Attorney, Steven T. Normandia, Debra R. Neumann, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General*, for appellee.