**FIFTH DIVISION**
**MERCIER, C. J.,**
**MCFADDEN, P. J., and RICKMAN, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**December 9, 2024**

# In the Court of Appeals of Georgia

A24A1184. RUSSELL v. THE STATE.

RICKMAN, Judge.

Following a jury trial, James Russell was convicted of three counts of family violence aggravated battery for causing severe injuries to his minor child.[1] On appeal, Russell contends that the trial court plainly erred by failing to instruct the jury properly on how to consider evidence of his good character. We disagree and, therefore, affirm.

Viewed in the light most favorable to the verdict,[2] the evidence presented at trial showed that James and Crystal Russell had two children together. In April 2019,

---

[1] Russell was also indicted for and found guilty of first degree cruelty to children, but that count merged with the remaining counts for sentencing purposes.

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

when their youngest child, N. R., was approximately 39 days old, Crystal woke up around 10:00 in the morning to give him a bottle and noticed that his left foot was blistered and red. She called James, who was at probation class,[3] and told him that he needed to come home so that they could take N. R. to the hospital. They drove from Dublin to Navicent Health Medical Center in Macon, where CT scans were performed on N. R. that revealed bleeding on both sides of his brain in several distinct spots. Some of the injuries were very recent, within the last week, and some were older. Because Navicent Health was not equipped to address all of his injuries, N. R. was transferred by helicopter to Children's Healthcare of Atlanta.

At Children's Healthcare, the burn on N. R.'s foot was assessed and it was noted that the burn encompassed the sole of his foot and extended around all of his toes, making the skin look very abnormal.[4] The foot injury was consistent with an immersion burn where the foot is placed into hot water and held there.

---

[3] James was attending probation class as part of an August 2017 plea under the First Offender Act to statutory rape.

[4] N. R. was ultimately transferred to the Grady Hospital burn unit because his burn was so significant.

The CT scans showing bleeding in various areas of N. R.'s brain were observed by a doctor from Navicent Health and the child abuse pediatrician at Children's Healthcare. Both doctors testified that the bleeding was consistent with blunt force trauma or the child being shaken very hard.

During N. R.'s assessment at Children's Healthcare, additional injuries were discovered. He had a torn frenulum (the band of tissue that runs from the bottom of your tongue to the base of your mouth), which was consistent with someone forcefully jamming a bottle or pacifier or some other object into his mouth. In addition, N. R. had 15 fractures, including fractures on both sides of his skull, a rib fracture, and fractures to bones in his arms, legs, right foot, and right hand. Some of the fractures were very recent and others had begun healing.

The child abuse pediatrician from Children's Healthcare testified that, given N. R.'s age at the time, his injuries could not have been self-inflicted. The doctor ultimately agreed that N. R.'s injuries were caused intentionally and resulted from abuse or torture over some period of time.

In April 2019, after N. R. had been transferred to Atlanta for treatment, an officer with the Laurens County Sheriff's Office obtained statements from Crystal and

James Russell. The officer learned that no one other than the parents had been caring for N. R. during the time leading up to when N. R.'s foot was burned. James's explanation for what could have caused the burn injury was that the bottle warmer had caught on fire and, as he was pulling it out of the wall socket, water from the warmer splashed on him. He said that he did not realize the water had also splashed on the baby until the next morning when Crystal called to tell him about the burn.[5] James told the officer that he did not know what other injuries his child had sustained and did not want the officer to tell him about them.

DFACS also investigated the injuries to N. R. A DFACS employee visited the Russell home and spoke to both parents. James told her that on the day of N. R.'s burn injury, he got up at 4:00 a.m. to fix N. R. a bottle and then offered the same explanation he had given to the Laurens County officer with respect to the problem with the bottle warmer. James claimed that N. R. did not cry as a result of the incident, so he fed him, changed his diaper, swaddled him, and put him back to sleep. Crystal said she was asleep at the time and did not notice the burn until approximately 10:00

---

[5] The pediatric emergency room physician who treated N. R. at Navicent Health testified that his foot injury was not consistent with hot water merely splashing on it.

that morning when she woke up to give the baby a bottle.[6] James and Crystal denied knowing about the other injuries to N. R., including the brain bleeds.

A DFACS special investigator got involved in May 2019. Crystal told the special investigator that she had delivered N. R. via cesarean section and, as a result, she was taking pain medication and was on bed rest, which meant that James was doing most of the caregiving. Crystal had no explanation for N. R.'s broken bones. James confirmed that he was N. R.'s primary caregiver because Crystal was taking pain medication post-delivery. He told the special investigator that, upon further reflection, he realized that he did not spill the bottle warmer water on N. R.'s foot but instead, when he leaned over, the baby's foot dipped into the hot water from the bottle warmer. When asked for plausible explanations for N. R.'s other injuries, James provided the following: he drove down a bumpy dirt road with N. R. in the car; he dropped N. R. but caught him by the arm before his head hit the floor; he and N. R. were taking a shower together and N. R. slipped out of his arms when he stepped out,

---

[6] Crystal testified that although James told DFACS that the bottle warmer incident happened in the bedroom, they never had the bottle warmer in the bedroom and were not using it at the time.

so he caught him by the arm; and, on another occasion, he was carrying N. R. down the stairs and lost his balance so he squeezed N. R. with his arms around his ribs.

James was arrested and charged with one count of first degree cruelty to children and three counts of family violence aggravated battery. The jury found him guilty on all charges, and he was convicted of three counts of family violence aggravated battery. Crystal was also arrested and was charged with the same three counts of family violence aggravated battery as well as first degree cruelty to children for striking another one of her children.[7] Crystal pled guilty to all of the charges against her, but she testified at trial that she was not admitting that she had abused either of her children, only that she had not been paying attention to what was going on with them.

James filed a motion for new trial in which he asserted the general grounds and an amended motion for new trial in which he challenged the trial court's jury charge on character evidence. Following a hearing, the trial court denied the motion on all grounds. This appeal followed.

---

[7] James is not the biological father of that child, who was living with his grandmother and her husband in Florida at the time of the incidents at issue in this case.

James's sole enumeration of error is that the trial court plainly erred by failing to instruct the jury properly on how to consider evidence of his good character. He does not dispute that he failed to object to the jury charge on this ground during the charge conference or at the time it was given but challenges the trial court's conclusion that there was no plain error.

Notwithstanding the failure to object at trial, "appellate review for plain error is required whenever an appealing party properly asserts an error in jury instructions." *State v. Kelly*, 290 Ga. 29, 32 (1) (718 SE2d 232) (2011); see OCGA § 17-8-58 (b). To establish plain error in the context of jury instructions, the following standard must be met:

> First, there must be an error or defect—some sort of deviation from a legal rule—that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

(Citation and punctuation omitted.) *Kelly*, 290 Ga. at 33 (2) (a).

During the charge conference, the trial court provided counsel for the parties with a proposed set of jury instructions, which included the pattern instruction on good character of the defendant.[8] When the trial court mentioned that particular charge, the State argued that bad character evidence should be included in the same charge. After extensive discussion, the trial court ultimately decided to remove the good character of the defendant charge entirely as well as a charge on criminal negligence. The following then transpired:

---

[8] The applicable pattern instruction provided:
You have heard evidence of the (character of the defendant) (character of the defendant for a particular trait, more specifically _____) in an effort to show that the defendant likely acted in keeping with such character or trait at pertinent times or with reference to issues in this case. This evidence has been offered in the form of (opinion of (an)other witness(es)) (reputation) (specific instances of conduct of the defendant showing such trait). You should consider any such evidence along with all the other evidence in deciding whether or not you have a reasonable doubt about the guilt of the defendant.

Suggested Pattern Jury Instructions, Vol. II: Criminal Cases (2021), § 1.37.10.

DEFENSE COUNSEL: [W]e're happy with the criminal negligence deletion. I do think we did get some good character evidence in that the jury needs to be directed on, so . . . .[9]

THE COURT: Well, . . . you can . . . get into that back over there where we're talking about the prior acts, you know, reputation of truthfulness, you got that already in the charge.

DEFENSE COUNSEL: Okay. Well, . . . I think that'll work for us then.

The trial court concluded that this exchange showed that James had affirmatively waived the issue.

"Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." (Citation and punctuation omitted.) *Cheddersingh v. State*, 290 Ga. 680, 684 (2) (724 SE2d 366) (2012). "An affirmative waiver may occur, for example, when a defendant requests a specific jury instruction but later withdraws such request, explicitly requests a jury instruction that he later argues on appeal

_____

[9] James introduced evidence from a few of his relatives, who testified that he does not have a reputation for being untruthful and that he has been around other young children and infants and appears to be competent in caring for them. In addition, James's pastor testified that James attended church regularly.

should not have been given, or objects to a charge that he later argues on appeal should have been given." (Citations and punctuation omitted.) *Vasquez v. State*, 306 Ga. 216, 229 (2) (c) (830 SE2d 143) (2019).

This case is similar to the situation in *Cheddersingh*, where the trial court asked defense counsel if the verdict form was acceptable to the defense and counsel responded, "I believe so. Let me look at it one more time[,]" and no objection was made. *Cheddersingh*, 290 Ga. at 684 (2). This Court concluded that the exchange with the trial court was not an intentional relinquishment or abandonment of a known right. Id. Similarly, here, the exchange with the trial court does not show that James intentionally relinquished his right to have an instruction given on the good character of the defendant; "rather, the failure to object is more appropriately described as a forfeiture of the right." Id.; Compare *Lee v. State*, 347 Ga. App. 508, 512 (2) (b) (820 SE2d 147) (2018) (on plain error review, where defense stipulated at trial that it did not challenge the chain of custody with respect to physical evidence presented by the State, defendant's affirmative statement that he had no objection to charge on stipulation waived any claim that trial court improperly referenced stipulation). Nor can we discern any tactical reason on the part of the defense to accept the trial court's

decision to remove the good character of the defendant charge. See *Cheddersingh*, 290 Ga. at 684 (2). Thus, any error in the trial court's failure to give the charge was not intentionally waived.

With respect to the other elements of the plain error test, we conclude that a good character instruction would not have changed the outcome of James's trial and we therefore "need not decide whether it was obvious legal error for the trial court not to instruct the jury . . . on [James]'s good character." *Hamilton v. State*, 317 Ga. 337, 341 (3) (a) (893 SE2d 54) (2023). The evidence against James was strong. He and Crystal were the only caregivers to R. N. during the relevant time period, and James handled about 90% of the caregiving duties. James offered no plausible explanations for the severe injuries to his 39-day-old child, and expert testimony was presented that those injuries were intentionally inflicted over some period of time. In addition, the jury here was instructed to "giv[e] consideration to all of the facts and circumstances of th[e] case" and to "determine the facts of the case from all of the evidence presented." Given these circumstances, James has not demonstrated that it is likely that the jury would have reached a different result if it had been expressly told that it could consider the nebulous evidence of James's truthfulness or prior childcare

experience along with all the other evidence. See *Hamilton*, 317 Ga. at 341-342 (3) (a);

*Smith v. State*, 307 Ga. 680, 688 (3) (838 SE2d 321) (2020). Accordingly, this claim

fails.

*Judgment affirmed. Mercier, C. J., and McFadden, P. J., concur.*